WILLIAM F. THOMPSON *vs.* PIONEER-PRESS COMPANY.

## July 27, 1887.

**Trial—Directing Verdict.**—When the case is such that the court would be· compelled to set aside a verdict, if rendered in favor of a party, because· not reasonably supported by the evidence, the court may direct a verdict for the opposite party.

**Same—Testimony Unworthy of Credit.**—The testimony of a party in his· own behalf considered to be so unreasonable and inconsistent, and so op-- posed by undisputed circumstances and by other evidence, as to be un-- worthy of credit, and as justifying the court in directing a verdict against. such party, as respects particular matters in issue.

**Libel—Justification.**—The truth, when relied upon in justification of a libel,. must, to constitute a complete defence, be as broad as the defamatory ac-- cusation.

**Same—Evidence—Justification.**—Evidence of the truth of a libellous accu-- sation relied upon in justification, *held* not such as to have authorized. the court to direct a verdict for the defendant as to this issue.

Appeal by plaintiff from an order of the district court for Henne-- pin county, *Young*, J., presiding, refusing a new trial, a verdict hav-- ing been directed in favor of the defendant.

*Hart & Brewer*, for appellant.

*Eugene M. Wilson*, for respondent.

DICKINSON, J.[1] This is an action for a libel, in which the plaintiff was charged with the embezzlement of the money of his employers, Farnham & Lovejoy; with seeking to blow open their safe, and steal. and destroy their books; and with perjury. The defendant alleged the truth of these charges in justification. After a trial upon the· issue thus presented, the court directed a verdict for the defendant;. and this is the assigned error upon which the case comes here. It is hence necessary for us to consider whether the evidence was such as would have reasonably justified the jury in rendering a verdict for·

[1] Berry, J., because of illness, took no part in the decision of this case.

the plaintiff, or whether the guilt of the plaintiff was so conclusively shown by the case that such a verdict should not have been allowed to stand. We will first consider the charge of embezzlement.

The partnership of Farnham & Lovejoy were doing an extensive business at Minneapolis in the manufacture and sale of lumber. In the spring of 1879 the plaintiff was employed by them as their book-keeper and cashier. He remained in that employment until September, 1882. During this time it was the plaintiff's duty to receive, dispose of, and account for all moneys coming in from the partnership business. The books of the office, as kept, consisted of a day-book or blotter, in which original entries were made of transactions as they occurred; a journal, to which the blotter entries were transferred; and a ledger, which was posted from the journal. There was no separate cash-book kept in the usual way of keeping such books, although it is claimed on the part of the plaintiff that there was what was called a petty-cash book, to which we shall hereafter refer. The "cash" account, as kept in the ledger, was intended to show the actual cash transactions and state of the accounts. The sums with which "cash" was there debited should represent and show all of the money received, and the sums with which "cash" was credited should represent the amounts paid out by the plaintiff; and the difference should be in his possession in money. One source from which large amounts of money came into the hands of the plaintiff, as cashier, was as follows: One Crombie had charge of the lumber yard, and of sales there made. He received the price of lumber sold in the yard, entering it in a book kept by him for that purpose. This money he paid to the plaintiff at the office, rendering also an account of his sales from his book. These transactions were then entered in the office day-book, (blotter,) and should have been subsequently, in the course of the office work, transferred to the journal, and posted in the ledger. The work of transcribing the entries from the day-book to the journal, and the posting in the ledger, was done by the plaintiff personally.

Without referring particularly to an error of three dollars occurring in May, 1879, we look to the manner of keeping the accounts commencing December 19, 1879, and as it continued through the remain-

der of the period of the plaintiff's employment. In that month the plaintiff, in posting in the "cash" ledger account, raised three several items, as appearing in the journal entries, to the aggregate amount of $329.02; thus making it to appear in the cash account that that amount of money had been paid out, which did not appear in the other books to have been disbursed. In the following month, January, 1880, in posting to the same account in the ledger, the plaintiff reduced the journal entries of cash received, in three instances, the reduction aggregating $225. Three smaller errors of the same kind occurred in February and May following, and subsequently other irregularities of a like kind, to the amount of about $700, to which we need not further particularly refer. Passing over two or three other errors, we come to November, 1880, when a cash item of $1,162.21 appears to the credit of the ledger cash account, which does not appear on the day-book or journal. From the beginning of May, 1881, until the close of his service, and covering every month in that period, the plaintiff, in transferring entries from the day-book to the journal, designedly, and not by mistake, dropped numerous items of cash received by him from sales by Crombie, so that they neither appeared in the journal, nor, of course, were they charged in his ledger cash account, as money received should have been. Yet the items thus dropped from the accounts were checked in the margin, in the manner indicative of their having been carried on or posted, as was done with items actually posted. These sums thus dropped from the accounts, and never charged in the cash account, amounted to more than $10,000, and the aggregate of the irregularities here referred to was about $17,000; yet, when the employment ceased, this cash account, made up in this manner, with this large amount of fictitious entries, and of actual receipts omitted from it, "balanced;" no amount of cash being turned over by the plaintiff in excess of what appeared as cash on hand in the account made up in this manner.

The facts which we have now stated are shown in the case beyond any question or dispute, and for the most part are admitted by the plaintiff himself. In the absence of any explanation of such extraordinary transactions, from the plaintiff, exculpating himself, there could be but one conclusion as to his guilt. He seeks by his own tes-

timony to offer such an explanation. It is, in substance, this: He received the money. But it was the habit of Lovejoy, who was the financial manager of the firm business, to take from the plaintiff, from time to time, money for use, as he (Lovejoy) said, in affairs of the firm, outside of the business to which these books related. He would take money also for use in this firm business, without knowing at the time just how it would be used. In these cases he instructed the plaintiff to make no entry of the money so taken until he should report what had been done with it, which he often did not do. In this way the cash shown by the books to have been received was continually short, because of there being no corresponding charge of these funds taken by Lovejoy. Upon complaining to Lovejoy of this, the plaintiff was directed by Lovejoy to falsify his accounts in the manner above shown, and to make entries arbitrarily to balance his accounts. He instructed the plaintiff, in posting from his book of original entries, to drop items of money received, so that his cash account would balance, and upon that instruction, and *for the purpose only of balancing his cash account*, he pursued the course of dropping items of money received from Crombie. He says also that he did in fact keep a small book, referred to as a petty-cash book, in which he set down all cash items, including the money paid to Lovejoy, and that he left that book in the office when he was discharged. It is a matter of dispute whether there ever was such a book. The plaintiff's testimony of such a book being kept as a part of the office accounts is opposed by the evidence of the other witnesses, who must have known the fact if it had been so. But, in our opinion, if there was such a book, it does not much help the plaintiff's case.

This, in brief, is the manner in which the plaintiff accounts for the disposition of about $17,000 of money received by him, but which is neither found in his hands, nor charged in the regular account-books kept by him. This deficiency was unknown to any one, unless Lovejoy is to be excepted, until it was disclosed by an expert examination of the books, after the plaintiff was discharged. Such, at least, is the evidence, and there is nothing opposing it save the inferences which may be drawn from the plaintiff's account of the transaction, which we have stated in substance. He does not claim that Farnham, who

was actively interested in the business, was ever informed of these irregularities, or that he knew anything about them, unless knowledge is to be inferred from the alleged fact that it was all done under the direction of Lovejoy. It is not claimed that any other person took the money or falsified the accounts. In brief, the only conclusion possible, or claimed to be possible, is, either that the plaintiff converted the money to his own use, and falsified the accounts to conceal the embezzlement, or that Lovejoy took the money from the plaintiff, and directed him to pursue this system of falsifying the accounts in the manner stated, so that they would balance, notwithstanding the moneys taken by Lovejoy and not charged. The plaintiff's explanation involves the further fact that he did not suppose that Lovejoy's use of the money, and his directions as to the accounts, were not honest as towards Farnham, the other partner. The theory of the plaintiff rests upon his own testimony alone. If the explanation which he gives is not true, the inference of his own guilt, to be drawn from the undisputed facts of the case, is wholly unopposed. In general, disputed questions of fact must be submitted to the jury; and the jury is to judge of the credibility of witnesses. But, after a studious examination of this extraordinary case, the majority of the court is undoubtingly of the opinion that the testimony of the plaintiff upon this subject, and the theory upon which alone he rests, are entirely unworthy of credit, and should not be accepted by any court or jury as the basis for a verdict. Aside from the statement of the case already made, we shall refer particularly to only some of the more important considerations which have led us to this conclusion.

It is to be observed that, according to the plaintiff's testimony, this falsifying of the accounts was not for the purpose of *concealing* an abstraction of money, but merely for the honest purpose of keeping the accounts balanced; the money being short on account of what was delivered to Lovejoy, but not charged. But the sums taken by Lovejoy were not the identical amounts paid in by Crombie, and had no relation to the specific sums received by the plaintiff. The extreme difficulty, if not mathematical impossibility, of just balancing the accounts, and covering a deficiency occasioned in this

v.37m—19

way, and keeping them balanced continuously day by day, or month after month, for a long period, by simply dropping specific sums paid in by Crombie, is apparent. It might occur, on one day or week or month, that, by studious examination of the items thus paid in, an aggregate could be made up from some of them which would just equal what Lovejoy had taken and failed to account for. But, while this might sometimes occur, it would probably be mathematically impossible that, at successive postings day after day, week after week, and month after month, this result should be always attainable. This difficulty becomes apparent to the mind of the plaintiff upon his cross-examination. Then, for the first time, (while he does not revoke his statement that the purpose of these falsifications was merely to balance his accounts,) he admits that this process did not in fact make his cash balance; that he did not make charges enough at one time to do that; but that, in the latter part of his work on the books, he ascertained with Lovejoy just what the shortage then was, and he dropped enough items, in addition to those before dropped, to exactly balance the account. Thus far, then, his testimony is, in substance and effect, this: that he continuously, and for a period of about 15 months, pursued the system of dropping from his accounts items of money received, for the purpose of balancing his accounts, but nevertheless his accounts were *not* thus balanced until it was accomplished by a final process at about the end of his service.

Let us look at this theory in another view of the plaintiff's testimony, bearing in mind that, according to his explanation, these falsifications were for the purpose of keeping his accounts straight. He says that in the petty-cash book to which we have referred, and which was, according to his testimony, one of the account-books of the office, he entered all these sums of money taken by Lovejoy. He does not claim that that book showed also these droppings from the cash receipts. But an examination of the state of the accounts, as shown by such a cash-book, in connection with the ledger cash account, would, upon the plaintiff's theory, show an *excess* of cash on hand over the amount actually in possession, equal to the sum of these falsifications. Thus, while he dropped these items for the purpose of

making his account balance, he really thereby threw his account out of balance, to the extent of many thousand dollars, if his testimony is true. There is nothing in the plaintiff's case to suggest any way to avoid this absurd conclusion, nor is it suggested in his behalf that he was not a competent, skilful book-keeper, fully understanding just what he was doing.

But, apart from the self-destructive inconsistencies of this account of the transaction, it is further rendered incredible by its inherent improbability. The features of improbability to which we further refer are so obvious, upon a statement of the case, that we will here only allude to them without comment. It is out of the ordinary course of human conduct, affected by the motives which ordinarily actuate and control mankind, that Lovejoy, using the money of the firm, either legitimately in its business, or otherwise and wrongfully, should instruct his cashier and book-keeper, the fiduciary custodian and accountant over a business amounting to from $30,000 to $50,000 a month, to falsify his accounts in this manner, so as to apparently bury and conceal the real fact from further discovery, and this only because the accounts were out of balance; that such a course should be pursued for a long period of time, without any apparent knowledge on the part of Farnham, the other partner, and yet the plaintiff suppose that this was a legitimate course of procedure towards him, and that he should never have spoken to Farnham about it; that the plaintiff, even though instructed by one of the partners only to pursue such a system of falsifying his accounts, should have honestly consented to do so, without any advantage to accrue to himself, without at least a full understanding with both of his principals, in view of the fact that the accounts made up in this way, so far at least as the regular account-books would show, would, upon careful examination, charge him by his own entries with embezzlement,—that is, with the receipt of funds, to the extent of many thousands of dollars, in excess of the sum of money shown to have been paid out in addition to that still on hand; that he should continue to pursue this questionable and extraordinary method of balancing his cash account when, as he testifies, it did not effect that result.

But while such considerations, drawn from the plaintiff's testimony,

strongly characterize it as untrue, that conclusion is very greatly strengthened by the other evidence in the case.   Individual witnesses might, of course, be mistaken or testify untruly; but it is in the highest degree improbable that the large number of witnesses arrayed against the plaintiff in this case, many of them disinterested, and testifying in respect to disconnected transactions, and fortified by peculiar, admitted facts, should all be mistaken or untruthful; and the plaintiff alone, discredited by the inherent improbability of his story, should be deemed to have disclosed the truth.   Without unduly extending this opinion, we can hardly do more than refer to some of these things.

Lovejoy denies that he ever gave any such authority, or used the funds of the firm without rendering account to the plaintiff, and that he knew nothing of these irregularities.   Farnham denies all knowledge of it.   Many disinterested witnesses testify to the plaintiff's declarations of his being impoverished during the time of this employment, and of his inability to meet certain liabilities, and that, upon examination upon proceedings supplementary to execution, he disclosed no available property; yet during this period he had deposits in banks, and had one bank-account in a fictitious name.   He was also loaning money and discounting notes; and when he was discharged after a service of about three years and a half, at a salary ranging from $1,500 to $2,000 a year, he had some $11,000 in money and notes.   In seeking to account for this, he alleges, among other things, that $3,000 of it was a debt paid him, as he thinks, by one Jacobs, who had gone to the Black Hills.   He is unable to state whether Jacobs sent the money by express or by draft, or any fact connected with the payment, beyond the fact that it was paid.   On a former trial the plaintiff had testified that he thought this $3,000 came from one Cooke, instead of Jacobs.   One Reed was an assistant to the plaintiff in the office, and afterwards took his place.   Reed testified to informing plaintiff that Farnham & Lovejoy wanted him (Reed) to re-examine the plaintiff's work upon the books, and that the plaintiff admitted to him that there were errors there that would send him to the penitentiary; and that the plaintiff approached him upon the subject of his (plaintiff's) getting possession of the books,

and that he placed $500 in money in Reed's possession, together with five $1,000 notes of the plaintiff, payable to Reed in two, three, four, five, and six years, without interest. These interviews were disclosed at the time by Reed to his principals. The money was brought into court, and deposited there by Reed. The notes were also produced. The plaintiff admits the payment of the money, and the giving of the notes, but alleges that the former was paid to Reed to be delivered to a friend of Reed's, who was going east, and to be used by him in efforts to secure a right to Reed and plaintiff to conduct an express business over the line of the St. Paul, Minneapolis & Manitoba railway, and that the notes were to be used for the same purpose.

There are other circumstances and other evidence in the case which have added weight to what we have referred to in bringing us to the conclusion indicated; but we deem it unnecessary in support of this conclusion to refer to them here. Some of the matters to which we have alluded would not, standing alone, be deemed of very great importance upon the precise question under consideration, and would be proper for the consideration of a jury. But the combination of so many circumstances, rendering improbable the plaintiff's testimony; so many witnesses opposing him upon different and distinct facts relevant to the issue; his admitted extraordinary falsification of the accounts as to money received by him, so as to conceal the real transactions, but professedly only to balance his accounts,—all in our judgment so overwhelmingly show the plaintiff's account to be false that a court could not allow a verdict in his favor upon this point to stand, without disregarding its duty of determining whether there is evidence reasonably tending to support such a verdict. When such is the case, the court may direct a verdict. A court is not required to submit a cause to a jury, without direction, when a verdict in only one form could be sustained, and when, if a contrary verdict was to be rendered, it would be the plain *duty* of the court, not a matter of *discretion,* to set it aside. *Abbett* v. *Chicago, Mil. & St. Paul Ry. Co.,* 30 Minn. 482, 484, (16 N. W. Rep. 266;) *Randall* v. *Baltimore & Ohio R. Co.,* 109 U. S. 478, (3 Sup. Ct. Rep. 322;) *Dwight* v. *Germania Life Ins. Co.,* 103 N. Y. 341, (8 N. E. Rep. 654.) Whatever may be

the truth in this remarkable case, we think it is entirely apparent that the plaintiff's explanation does not present it.

The same reason which justified the court in its determination with respect to the alleged embezzlement also covers the alleged perjury; for, before the publication of the article complained of, the plaintiff had verified by his oath an answer in an action brought by Farnham & Lovejoy against him for the same embezzlement here under consideration, which answer denied the embezzlement.

But the justification, by alleging the truth of a libellous publication, must, to constitute a full defence, be as broad as the defamatory accusation; and it remains to consider the charge that the plaintiff sought to blow open the safe of Farnham & Lovejoy, and steal and destroy their books; and in what I say upon this point I express the opinion of Mr. Justice Vanderburgh and myself. In the view which we take of this feature of the case, it is unnecessary to refer particularly to the evidence. It may be conceded that there is strong evidence to support the alleged truth of the charge. This depends upon the testimony of Reed. It is of course denied by the plaintiff; and, as no overt act was ever committed beyond negotiating with Reed, the plaintiff's denial was perhaps all that could be expected to be opposed to Reed's evidence. If, as was the case in respect to the embezzlement, the admitted circumstances had been such as, unexplained, to show the plaintiff guilty of this charge, it is perhaps doubtful whether the plaintiff's testimony in denial should be deemed worthy of any credit. But his innocence of this charge does not depend necessarily upon his testimony. Whether he was shown to be guilty depends upon the testimony of Reed, with some circumstances not inconsistent with innocence of this particular offence. From an examination of Reed's testimony, we are satisfied that, entirely independent of the question as to what credit is to be given to the plaintiff's denial, the case was one for the jury, and that the court erred in taking this part of the case from the jury.

As Mr. Justice Mitchell thinks that the whole case ought to have gone to the jury, the result of the opinions held by the majority of the court is that a new trial must be allowed.

Order reversed.

GILFILLAN, C. J.   I think the action of the court below in directing a verdict for defendant was right, and that the order ought to be affirmed.

MITCHELL, J.   I admit that the explanation of the plaintiff is very improbable, unnatural, and unreasonable,—so much so that, if I were a juror, I would probably have very little difficulty in arriving at the conclusion that he embezzled his employers' money, and then falsified the books to conceal his crime.   But his version of the affair is neither physically nor morally *impossible*.   Under such circumstances, I cannot admit the right of the court to take the case from the jury, and assume to decide that the evidence of the plaintiff was false.   A court has an undoubted right—and it is often its duty—to aid the jury by an analysis of the evidence; but, as long as juries are made by law the exclusive judges of the facts,—in other words, as long as a jury is a jury,—it is peculiarly their province to judge of the credibility of witnesses; and a court has no right to take a case from them on the ground that a witness is not entitled to credit, unless it might possibly be in a very extreme case, when it was absolutely impossible, either physically or morally, that his evidence could be true.   If the case were to stand alone, I would not feel called upon to express any dissent.   But, if the action of the trial court in this case is approved, it may become a precedent for a very dangerous invasion of the right of trial by jury.

Therefore, while concurring in the order granting a new trial, I dissent from the views expressed in the first part of the opinion of the court.