Robert D. BENSON, Appellant,

v.

NORTHWEST AIRLINES, INC., et al., Respondents.

No. C1–96–1317.

Court of Appeals of Minnesota.

April 1, 1997.

Review Denied June 11, 1997.

532

Thomas E. Marshall, Mackall, Crounse & Moore, P.L.C., Minneapolis, for Appellant.

Carol A. Peterson, Adele H. Page, Dorsey & Whitney, L.L.P., Minneapolis, for Respondents.

Considered and decided by AMUNDSON, P.J., TOUSSAINT, C.J., and HARTEN, J.

## OPINION

AMUNDSON, Judge.

Appellant Robert D. Benson brought this action against respondents Northwest Airlines, Inc. (Northwest), Karen Pierce, and Harvey Armstrong, alleging various claims concerning his employment and discharge from Northwest. On appeal from a judgment entered on the defamation and retaliatory discharge claims and denial of posttrial motions, Benson argues: (1) the district court abused its discretion in evidentiary rulings admitting portions of his medical records and limiting testimony of his witnesses; (2) the district court erred in its jury instructions on defamation and retaliatory discharge and the special verdict forms for the defamation claim; (3) the district court erred when it denied his motion for JNOV; (4) the evidence was insufficient to support the jury's verdict and the district court's findings of fact; (5) the district court erred when it dismissed his negligent hiring and retention claim; (6) dismissal of his federal disability discrimination claim did not prevent him from asserting a claim under the Minnesota Human Rights Act (MHRA); and (7) inappropriate costs and disbursements were awarded to Northwest. Northwest, by notice of review, argues that it held a qualified privilege and was entitled to summary judgment or a directed verdict on the defamation claim. Northwest also seeks reversal of the district court's ruling allowing Benson to add a claim for punitive damages. We affirm.

## FACTS

Beginning in March 1988, Northwest employed Benson as an engineer in Northwest's Technical Operations engineering department. During his first two years he was supervised first by Harvey Armstrong and then by Karen Pierce, both of whom rated his overall performance as "rock solid" or "generally superior." In August 1990, Benson was placed in charge of a newly formed project entitled New Product Development. Approximately two months later, Armstrong and Pierce recommended that Benson be promoted to Senior Engineer. On January 1, 1991, Benson's promotion became effective.

In February 1991, Benson met with Bruce Rismiller, an executive vice president of Northwest, to discuss the New Product Development project. Armstrong and Pierce did not know about Benson's meeting with Rismiller until after the meeting. Benson's supervisors were upset with him for not informing them before he met with a Northwest executive because they often received questions or comments back and needed to be able to respond. Subsequently, on several occasions Pierce raised her concerns with Benson that problems had developed relating to his work performance and behavior.

On October 8, 1991, at a meeting with Armstrong and Pierce, Benson received a letter written by Pierce. The letter, dated October 5, 1991, detailed a number of "performance issues that [had] been raised and unresolved over the past nine months." The letter identified five problems with Benson's performance:

1. Willful disobedience of any work assignment or management request or tardiness/failure to attend scheduled meetings with management.

2. Circumnavigation of immediate management to resolve project issues or bypass their review of departmental communications prior to distribution.

3. Insubordinate and disruptive behavior.

4. Unprofessional and inappropriate displays of anger.

5. Displays of uncontrolled emotion (tearful crying sessions).

Pierce's letter also listed specific incidents, by date and description, that exemplified the performance problems. Benson characterized the letter as lies, but nonetheless agreed to work things out.

A week after receiving the letter, Benson took a six-week medical leave during which he received counseling and treatment for depression. While on medical leave, Benson received a letter from Robert Tice, an attorney for Northwest, requesting Benson's security badges that allowed him access to Northwest. On November 4, 1991, Benson met with Pierce, Armstrong, and Tice about suspected unauthorized use of Northwest's computer equipment and access to Benson's e-mail. Benson denied any involvement. He also claimed that Tice said that the airline requested his security badges because it was concerned he would come in and "shoot somebody." Pierce and Armstrong denied Tice made any such statement.

In early December 1991, Benson returned to work. On February 7, 1992, Benson received a performance review for the previous year from Pierce that rated his performance as "frequently unsatisfactory," the lowest rating on the scale. Benson decided to leave the engineering department. He was placed on a two-week unpaid leave to find another position within the company.

In March 1992, Benson transferred to a mechanic position and was assigned to recondition airplanes. On October 7, 1992, while working on his hands and knees installing insulation in a DC–10, Benson experienced severe chest pain and muscle weakness, which was determined to be a relapse of Parsonage–Turner syndrome. Since the 1970s Benson has suffered from the syndrome, also known as brachial plexopathy, which affects the nerves and muscles of his left arm and shoulder. Benson's condition had been asymptomatic until he experienced the chest pains. As a result of the relapse he missed several days of work.

Subsequently, Benson worked in other positions that accommodated his condition, including a temporary position in Northwest's recycling department. By letter dated December 7, 1992, Benson's treating physician, Dr. Edrie Kioski, provided Northwest with the following evaluation and recommendation:

It is my opinion that [Benson] should not be involved in any kind of work that involves extensive use of the left arm or repetitive motions of the left shoulder, for the rest of his working career, because he is likely to suffer further relapses and require extensive periods on disability. In particular, his previous job as a mechanic, would be totally inappropriate for his condition.

Benson transferred to the Plant Maintenance area. Four days later, however, the Manager of Plant Maintenance, Richard Paxton, notified Benson that he was disqualified from the mechanic position due to the medical limitations established by his physician.

Thereafter, Benson pursued a workers' compensation claim for the October flareup of his shoulder condition allegedly caused or aggravated by his work. On December 21, 1992, Benson signed a First Report of Injury, which was filed with the appropriate state agency and the administrator of Northwest's workers' compensation plan.

By a letter dated December 23, 1992, Northwest informed Benson that based on his doctor's recommendation, "it is evident that you are not capable of performing the full duties of a mechanic because of permanent physical restrictions." The letter further stated Northwest's standard policy:

In view of this medical report, you are being placed on a 90 day unpaid personal leave of absence to expire on March 16, 1993. During this time, you will be expected to seek alternate employment at Northwest Airlines which is within your physical limitations. If you are unable to find a position by March 16, 1993, your employment with the Company will be terminated.

The letter was authorized by Chris Prieve, a Northwest Human Resources Representative, and signed by Paxton, Manager of Plant Maintenance. Neither Prieve nor Paxton was aware that Benson had filed a workers' compensation claim with Northwest. Benson did not find another position within the 90–day period. On March 16, 1993, Benson's employment with Northwest was terminated.

In July 1993, Benson brought this lawsuit claiming: (1) discriminatory discharge in violation of the Americans with Disabilities Act (ADA); (2) retaliatory discharge for filing a

workers' compensation claim in violation of Minn.Stat. § 176.82; (3) failure to provide personnel records and/or delete information in violation of Minn.Stat. §§ 181.961 and 181.962; (4) defamation; (5) intentional and/or negligent infliction of emotional distress; and (6) respondeat superior against Northwest including a claim for negligent hiring and retention of Pierce. Northwest removed the case to federal court. The federal court granted summary judgment to Northwest on the ADA claim and remanded the remaining claims back to state court.

The state district court granted summary judgment to Northwest on the personnel records, infliction of emotional distress, and negligent hiring and retention claims. The district court denied summary judgment on the retaliatory discharge, defamation, and respondeat superior claims. In addition, the district court granted Benson's motion to amend the complaint to add a claim for punitive damages, but denied his motion to add a claim for disability discrimination under the MHRA.

The defamation and retaliatory discharge claims were tried to a jury, the latter claim in the jury's advisory capacity. The jury returned verdicts in favor of Northwest on both claims and the district court adopted the verdicts in the court's findings of fact. Benson filed posttrial motions for JNOV, a new trial, and amended findings, which were denied. This appeal followed.

## ISSUES

1. Did the district court abuse its discretion when it admitted medical records documenting Benson's counseling history and limited testimony relating to Pierce's hiring and conduct with other employees?

2. Did the district court's defamation jury instructions misstate the law and erroneously place the burden of proving falsity on Benson?

3. Did the district court abuse its discretion in creating the special verdict form on defamation?

4. Did the district court err when it denied Benson's motion for JNOV?

5. Did the district court err in denying Northwest's motions for summary judgment and directed verdict on the defamation claim because of qualified privilege?

6. Did the district court err by allowing Benson to make a claim for punitive damages?

7. Did the district court abuse its discretion in its retaliatory discharge jury instructions

8. Are the district court's retaliatory discharge findings of fact clearly erroneous and unsupported by the record?

9. Did the district court err in dismissing Benson's negligent hiring and negligent retention claims?

10. Did the district court err in denying Benson's motion to amend his complaint to assert a claim under the MHRA?

11. Did the district court abuse its discretion in awarding ADR costs and travel expenses to Northwest?

## ANALYSIS

■ Benson contends that the district court erred when it denied his motion for a new trial on defamation.[1] In his motion for a new trial, he argued that the district court erred in its evidentiary rulings and improperly instructed the jury on defamation law. Now on appeal, Benson maintains that these errors prejudiced him to the extent that the only appropriate remedy is a new trial.

Generally the decision whether to grant a motion for a new trial lies "almost entirely"

---

1. Northwest asserts that Benson's appeal is untimely as to all issues raised in his new trial motion (except the sufficiency of the evidence issue) because he did not file his notice of appeal within 30 days after he received notice of the filing of the order denying his new trial motion. The controlling case, however, is *Hackett v. Department of Natural Resources*, 502 N.W.2d 425, 427 (Minn.App.1993), in which this court held that the timely appeal from a judgment will present all procedural errors preserved in a motion for a new trial. Here, Benson's appeal from the judgment was timely. Thus, the issues preserved in Benson's motion for a new trial are properly before the court.

within the discretion of the district court and will not be overturned absent an abuse of discretion. *200 Levee Drive Ass'n v. County of Scott*, 532 N.W.2d 574, 578 (Minn.1995).

## I. Evidentiary Rulings

Benson argues that the district court erred when it excluded testimony by William Uhl, a Northwest manager at the time Pierce was hired. Benson asserts that the district court incorrectly limited the testimony of Michael Gray and David Sindelar describing their problems with Pierce while employed under her supervision. Additionally, he claims that the district court improperly admitted his psychiatric medical records.

■ The question whether to admit evidence rests within the broad discretion of the district court, and the district court's decision will not be disturbed unless it constitutes an abuse of discretion or is based on an erroneous view of the law. *Uselman v. Uselman*, 464 N.W.2d 130, 138 (Minn.1990). A party's entitlement to a new trial on the ground of an improper evidentiary ruling rests on the party's ability to demonstrate prejudicial error. *EHW Properties v. City of Eagan*, 503 N.W.2d 135, 141 (Minn.App.1993).

■ Benson sought to introduce testimony by Uhl, a Northwest manager, who interviewed Pierce for an entry-level avionics engineer position, a position other than the position for which she was ultimately hired. Uhl recommended that Northwest not hire Pierce. The district court excluded any such testimony, concluding that although it may have been relevant to the dismissed negligent hiring claim, it was not relevant to the defamation claim. We agree. Uhl had no knowledge of Pierce's supervision of Benson, Benson's work performance, or the circumstances surrounding his defamation claim. Once the negligent hiring claim was dismissed, Uhl's testimony had little, if any, relevance to Benson's remaining claims.

■ Benson contends that the district court erred when it curtailed the testimony of Gray and Sindelar, two other Northwest employees under Pierce's supervision. Their testimony was limited to personal observations of Benson, his work performance, and his interaction with Pierce. The district court did not allow Gray and Sindelar to testify on their own performance issues with Pierce, ruling that such matters were remote and not relevant to Benson's claims. We cannot say the district court abused its broad discretion in these evidentiary rulings. Furthermore, Benson failed to demonstrate how the exclusion or limitation of Uhl's, Gray's, and Sindelar's testimony resulted in prejudicial error.

■ Benson offered portions of medical records documenting his psychiatric history to establish the source and extent of his mental suffering as it related to the defamation claim. By a motion in limine, Benson sought to limit the introduction of matters extending beyond the time period or scope relevant to his defamation claim. The district court's preliminary ruling limited the admission of the counseling records to those bearing on emotional distress from his work situation and the events forming the basis of his defamation claim.

Subsequently, under cross-examination, Benson attributed his marital and family problems to Northwest. Concluding that Benson had opened the door, the district court modified its ruling and allowed additional portions of his counseling history into evidence. The district court allowed Northwest to question Benson on his psychiatric history and whether he sought counseling for marital and family problems prior to his difficulties at work. The district court, however, limited questioning on the specifics of the counseling and prevented reference to certain prejudicial matters. The district court acted within its discretion and accordingly, Benson is not entitled to a new trial on the basis of improper evidentiary rulings.

## II. Defamation Jury Instructions

Benson contends that the district court erroneously instructed the jury on defamation and ignored the common law presumption of falsity in private plaintiff/private matter cases. He claims that the district court improperly shifted the burden to prove falsity to him and this resulted in substantial prejudice such that a new trial is appropriate.

■ A district court has broad discretion in its jury instructions, which need only "convey to the jury a clear and correct understanding of the law." *Kirsebom v. Connelly,* 486 N.W.2d 172, 174 (Minn.App.1992). A new trial is warranted only if erroneous jury instructions destroy the substantial correctness of the charge, cause a miscarriage of justice, or result in substantial prejudice. *Id.* In this case, the district court's instruction on defamation to the jury read in part:

> To prove his defamation claims plaintiff must prove each of the following * * * by the greater weight of the evidence. One, the statement must be defamatory. Two, the statement must be false. Three, the statement must refer to the plaintiff; and four, the statement must be published. * * * The plaintiff must also prove that the alleged defamatory statements are false. True statements however disparaging do not support a claim of defamation. Minor inaccuracies in the allegedly defamatory statements will not satisfy the plaintiff's burden of proving falsity.

Benson does not contend that the district court's instruction misstated the elements of defamation, but only argues that the instruction improperly shifted the burden of proving falsity to him.

■ Under firmly established Minnesota law, for a statement to be considered defamatory, it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him or her in the estimation of the community. *Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 886 (Minn. 1986). In private plaintiff/private matter defamation cases, the Minnesota Supreme Court has placed the burden of establishing each element of the claim on the plaintiff. *See Ferrell v. Cross,* 557 N.W.2d 560, 565 (Minn.1997) (burden of proving falsity is on plaintiff); *Rouse v. Dunkley & Bennett, P.A.,* 520 N.W.2d 406, 410 (Minn.1994) ("The elements of defamation require the plaintiff to prove that a statement was false * * *."); *see also Jeffries v. Metro–Mark, Inc.,* 45 F.3d 258, 261 (8th Cir.1995) (rejecting plaintiff's argument that Minnesota law places burden of proving truth on defendant and holding that the burden of proving falsity was on plaintiff), *cert. denied,* —— U.S. ——, 116 S.Ct. 102, 133 L.Ed.2d 56 (1995). Thus, the district court properly placed the burden of proving falsity on Benson.

■ Additionally, Benson challenges the basis for the district court's instruction that "minor inaccuracies in the allegedly defamatory statements will not satisfy the plaintiff's burden of proving falsity." This instruction, however, comports with Minnesota law.

■ As this court has noted,

> [A] plaintiff cannot succeed in meeting the burden of proving falsity by showing only that the statement is not literally true in every detail. If the statement is true in substance, inaccuracies of expression or detail are immaterial.

*Jadwin v. Minneapolis Star & Tribune Co.,* 390 N.W.2d 437, 441 (Minn.App.1986). We conclude the district court properly instructed the jury on defamation.

### III. Special Verdict Form

Benson claims that the special verdict form submitted to the jury was improper because it did not reflect Northwest's burden of proving truth. He faults the special verdict form because it did not separate out each allegedly defamatory statement contained within Pierce's October 5, 1991 letter and February 1992 performance review for the jury's consideration. Additionally, he claims that the district court omitted other allegedly defamatory statements from the special verdict form: (1) statements made by Pierce to Benson's employee assistance program counselor; (2) Tice's "shoot somebody" comment; and (3) Pierce's statement to Armstrong that Benson was not following his medical treatment.

■ The special verdict form correctly reflects the burden of proving falsity placed on Benson. The district court has discretion in wording the special verdict form and the court acted within its discretion when it instructed the jury to consider Pierce's letter and performance review as a whole. *See Cox v. Crown CoCo, Inc.,* 544 N.W.2d 490, 499 (Minn.App.1996) (district

court has discretion to choose particular wording of special verdict form). To segregate each statement contained within the letter and performance review for an independent series of questions to be answered by the jury would be unduly lengthy and would serve no meaningful purpose. Finally, the other allegedly defamatory statements were not contained in Benson's complaint. As such, the statements were beyond the scope of his claim. *See Thompson v. Campbell,* 845 F.Supp. 665, 679 (D.Minn.1994) (scope of defamation claim is limited to allegations in complaint). Accordingly, the district court did not abuse its discretion in creating the special verdict form.

### IV. JNOV Motion

■ Benson maintains the district court erred when it denied his motion for JNOV. He argues that JNOV was required because there was insufficient evidence to support the jury's defamation verdict against him. Specifically, Benson challenges the jury's finding that the statements in Pierce's October 5, 1991 letter were true.

When reviewing the facts in a case where JNOV has been denied, we must affirm if there is any competent evidence reasonably tending to sustain the verdict. *See Rettman v. City of Litchfield,* 354 N.W.2d 426, 429 (Minn.1984). Our review is even more limited when the verdict is based on a jury's consideration of the witnesses' demeanor. *See Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 256 (Minn.1980). We must view the evidence in the light most favorable to the jury's findings. *See Waite v. American Family Mut. Ins. Co.,* 352 N.W.2d 19, 21 (Minn.1984).

There is evidence in the record to support the jury's verdict. With the assistance of extensive notes kept in her daily planner, which corroborated her testimony, Pierce described the specific incidents listed in the October 5, 1991 letter. She testified to Benson's failure to attend meetings, his communication with senior management in writing and in person without prior notification or review by his immediate supervisors, as well as his unauthorized travel. She also described a number of one-on-one meetings in

which Benson became hostile, antagonistic, and raised his voice.

Furthermore, Pierce and her secretary, Jane Stratton, both testified to an incident where, following his initial compliance with Pierce's request to sign out and provide a time when he would be back, Benson returned angrily to erase the information. Pierce's daily-planner notes also indicated conversations in which Benson expressed frustration with his projects' progress and resulted in emotional crying sessions. Although Benson presented evidence to the contrary, it is the jury's role to weigh the witnesses' credibility and demeanor when there is conflicting testimony. Viewing the evidence in the light most favorable to the verdict, there was ample evidence to support the jury's finding that the statements in the October 5, 1991 letter were true.

### V. Qualified Privilege

■ Northwest, by its notice of review, contends that the district court erred when it denied its motions for summary judgment and, later, for a directed verdict on the defamation claim based on qualified privilege. A motion for summary judgment will be granted when the evidence as a whole shows that there is no genuine issue of material fact and that a party is entitled to judgment as a matter of law. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). A directed verdict will be granted only where the evidence as a whole requires the district court to set aside a verdict as manifestly contrary to the evidence or the law. *Claflin v. Commercial State Bank of Two Harbors,* 487 N.W.2d 242, 247 (Minn.App.1992), *review denied* (Minn. Aug. 4, 1992).

Minnesota recognizes that an employer may assert a qualified privilege as a defense to a defamation claim. *Stuempges,* 297 N.W.2d at 257. Qualified privilege applies to former and prospective employers in the context of employment recommendations if the statements are made in good faith and for a legitimate purpose. *Id.*

Regardless of whether Northwest firmly established the privilege, once the privilege is established by the employer, the employee must prove that the privilege has been

abused, which is generally a question for the jury. *Id.* Taking the evidence as a whole, there was a genuine issue of material fact as to whether Northwest abused its privilege. The district court did not err in denying Northwest's motions for summary judgment and a directed verdict.

### VI. Punitive Damages

Northwest argues that if this court remands for a retrial on the defamation claim, the court should also reverse the district court's order granting Benson leave to add his claim for punitive damages. Because we are not remanding the defamation claim, we need not reach the issue of punitive damages.

### VII. Retaliatory Discharge Jury Instructions

Benson argues that the district court abused its discretion in formulating its retaliatory discharge instruction for the advisory jury. Benson argues that, after instructing the jury on the three-part *McDonnell Douglas* analysis, the district court erroneously cautioned the jury not to "second guess" the legitimate reason for termination offered by Northwest. Benson claims the erroneous jury instructions prejudiced him and a new trial is appropriate.

■ A district court is allowed considerable latitude in selecting the language for jury instructions and all that is required is that the charge as a whole convey to the jury a clear and correct understanding of the law. *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn. 1986). Minnesota law applies the three-part analysis of the *McDonnell Douglas* test to retaliatory discharge claims under Minn.Stat. § 176.82. *Snesrud v. Instant Web, Inc.,* 484 N.W.2d 423, 427–28 (Minn.App.1992), *review denied* (Minn. June 17, 1992). The *McDonnell Douglas* test requires: (1) the plaintiff to bear the initial burden of establishing a prima facie case (i.e., that his or her discharge was the result of seeking workers' compensation benefits); (2) the burden of production then shifts to the employer to articulate a legitimate reason for the discharge; and (3) if the employer articulates a legitimate reason, the burden of production shifts back to the plaintiff to show pretext and the factfinder must determine whether the illegitimate reason (i.e., seeking workers' compensation

benefits) was more likely than not the reason for discharge. *See McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973).

■ Here, the district court correctly instructed the jury on the three-part *McDonnell Douglas* analysis. In discussing the second prong, Northwest's burden of production to articulate a legitimate reason for Benson's discharge, the district court stated:

A legitimate reason is any explanation unrelated to plaintiff seeking workers' compensation benefits. In considering the legitimate reasons stated by Northwest for its decision, you are not to second-guess that decision or otherwise substitute your judgment for that of the defendant.

Benson objected to the language prohibiting the jury from "second-guessing" Northwest's legitimate reason. He claimed that this interfered with the jury's ultimate determination—whether the illegitimate reason, seeking workers' compensation benefits, more likely than not was the reason for his termination. The district court's instruction, however, only referred to second-guessing the legitimate reason proffered by Northwest. The instruction did not impinge on the jury's ultimate determination whether Northwest was more likely than not motivated by an illegitimate reason. Therefore, the district court did not abuse its discretion when it instructed the jury on retaliatory discharge.

### VIII. Retaliatory Discharge Findings of Fact

■ Benson challenges the district court's findings of fact on his retaliatory discharge claim. He argues that the district court should have granted his motion for amended findings and adopted his proposed findings. A district court's findings of fact will not be set aside unless clearly erroneous, and due regard must be given to the opportunity of the court to judge the credibility of witnesses. *Davidson v. Webb,* 535 N.W.2d 822, 824 (Minn.App.1995).

The district court declined to adopt Benson's proposed findings because his proposed findings did not reflect the entire record and

were vague. Instead, the district court adopted Northwest's proposed findings, with some modifications, "because of the detail and accuracy reflected in those findings and conclusions." All of the district court's findings, except two, appear to be supported by the record. First, there is no evidence to support the finding that Benson worked in the "Aging Aircraft Division." Nonetheless, Benson did work in an area that refurbished and reconditioned 747s and DC–10s. Second, the district court stated in its findings that "[Benson] testified that he had made a request for workers' compensation benefits prior to [receiving a First Report of Injury form]." The district court then went on to state "the Court finds [Benson's] testimony on this point is not credible." Benson, however, never testified that he made a workers' compensation claim before receiving the First Report of Injury form. Although these specific findings are clearly erroneous, Benson does not demonstrate how he was substantially prejudiced by the findings. Rather, the findings appear to be merely harmless error.

## IX. Negligent Hiring and Retention

■ Benson contends that the district court erred when it granted partial summary judgment to Northwest and dismissed his negligent hiring and retention claims involving Pierce.

■ The Minnesota Supreme Court has defined negligent hiring as

> the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of employment, it should have been foreseeable that the hired individual posed a threat of injury to others.

*Ponticas v. K.M.S. Investments*, 331 N.W.2d 907, 911 (Minn.1983). A separate claim for negligent retention may arise when an employer becomes aware or should have become aware that an employee poses a threat and fails to take remedial measures to ensure the safety of others. *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 423 (Minn.App.1993), *review denied* (Minn. April 20, 1993). Most recently, we have held that negligent retention claims are limited to circumstances involving a threat of physical injury or actual physical injury. *Bruchas v. Preventive Care, Inc.*, 553 N.W.2d 440, 442–43 (Minn.App.1996). In this case, however, Benson failed to present any evidence that Pierce had any known propensities so that it should have been foreseeable to Northwest that she posed a threat of injury, physical or otherwise, to Benson or anyone else. Accordingly, the district court properly dismissed the negligent hiring and retention claims.

## X. MHRA Disability Discrimination Claim

■ Benson contends that the district court erred when it denied his motion to amend his complaint to assert a disability discrimination claim under the MHRA. Absent a clear abuse of discretion, a district court's denial of a motion to amend a complaint will not be reversed. *Hunt v. University of Minn.*, 465 N.W.2d 88, 95 (Minn.App. 1991). A motion to amend is properly denied "when the additional alleged claim cannot be maintained." *Id.*

Benson's proposed MHRA claim is barred by *Karst v. F.C. Hayer Co.*, 447 N.W.2d 180 (Minn.1989). In *Karst*, the supreme court held that the exclusive remedy provision of the Workers' Compensation Act (WCA) precluded a MHRA discrimination action by a disabled worker against his former employer when he became disabled as a result of work-related injuries and the former employer refused to rehire him due to the disability. *Id.* at 181. Benson filed, and eventually recovered benefits on, a workers' compensation claim. Therefore, he is precluded from pursuing a MHRA claim.

Benson argues that under *Hunter v. Nash Finch Co.*, 498 N.W.2d 759 (Minn.App.1993), he may bring his MHRA claim despite the WCA's exclusive remedy provision. The decision in *Hunter*, however, is readily distinguishable from the facts in this case. In *Hunter*, the plaintiff's disability upon which he based his discrimination claim resulted from a workplace injury (the loss of two fingers) at a previous employer over eight years earlier and his claim related to his

current employer's alleged failure to accommodate him reasonably. *Id.* at 762. The *Hunter* plaintiff's workers' compensation claim, however, related to a separate injury (carpal tunnel syndrome) which developed while working for his current employer. Accordingly, we concluded in *Hunter* that the plaintiff's discrimination claim was separate and distinct from his workers' compensation claim. *Id.*

In this case, however, the same disability—the aggravation of Benson's shoulder condition—formed the basis for both his discrimination claim and workers' compensation claims. Therefore, *Karst* is controlling and precludes Benson from bringing a MHRA disability discrimination claim, and the district court did not abuse its discretion by denying Benson's motion to amend.

## XI. Award of ADR Costs and Travel Expenses

Benson asserts that the district court abused its discretion in awarding costs and disbursements to Northwest. A district court's award of costs will be reversed only for an abuse of discretion. *In re Gerschcow's Will,* 261 N.W.2d 335, 340 (Minn.1977).

■ Benson objects to $561 in mediation fees awarded to Northwest. The pertinent provision from the Rules of Practice provides:

> It is presumed that the parties shall split the costs of the ADR process on an equal basis. The parties may, however, agree on a different allocation. Where the parties cannot agree, the court retains the authority to determine a final and equitable allocation of the costs.

Minn.R.Gen.Pract. 114.11(b). Because there was a lack of agreement over allocation, the district court did not abuse its discretion in awarding the costs to Northwest.

■ Additionally, Benson objects to the district court's award of costs for Northwest's counsel's $128.53 in travel expenses to take a deposition. The award of deposition costs is within the discretion of the district court. *See Striebel v. Minnesota State High School League,* 321 N.W.2d 400, 403 (Minn. 1982). We conclude that the district court

did not abuse its discretion in including counsel's travel costs in its award to Northwest.

## DECISION

The district court did not abuse its discretion when it denied Benson's motion for a new trial.

**Affirmed.**

HARTEN, Judge (concurring in part, dissenting in part).

Occasionally in the continuing evolution of the law, misconstrued appellate language metamorphoses into purported authority. The common law rule that presumes falsity in Minnesota private party/private matter defamation cases is the immediate casualty:

> At common law, a defamatory statement was presumed to be false. Truth was an absolute, affirmative defense.

*Jadwin v. Minneapolis Star & Tribune Co.,* 390 N.W.2d 437, 440 (Minn.App.1986). I therefore respectfully dissent from the court's defamation holding.

Beginning in 1964, the common law of defamation became subjected to constitutional limitations. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Rules were established in defamation cases depending upon the status of the parties involved, such as "public" or media parties:

> [A] balance was negotiated between protecting personal reputation and the competing social interest in unrestricted communication by a complex overlay of legal rules governing the elements of the prima facie case, defenses, and shifting burdens of persuasion.

*Jadwin v. Minneapolis Star & Tribune Co.,* 367 N.W.2d 476, 480 (Minn.1985). The common law presumption of falsity also was scrutinized and criticized. *See* Marc A. Franklin & Daniel J. Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity,* 25 Wm. & Mary L.Rev. 825, 854–63 (1984). The United States Supreme Court abrogated the common law presumption of falsity in cases involving media defendants or matters of public concern based on First Amendment considerations. *See Philadelphia Newspa-*

*pers, Inc. v. Hepps,* 475 U.S. 767, 776–77, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986) (holding the common law presumption inapplicable in cases involving media defendants or matters of public concern). The Supreme Court *has not considered* the applicability of the presumption to private plaintiff/private concern cases.

The court cites various cases, such as *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252 (Minn.1980), *Rouse v. Dunkley & Bennett, P.A.,* 520 N.W.2d 406 (Minn.1994), and *Jeffries v. Metro–Mark, Inc.,* 45 F.3d 258 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 102, 133 L.Ed.2d 56 (1995), for the proposition that Minnesota no longer recognizes the presumption of falsity in private defamation cases. Typical of the caselaw language cited in support of this proposition is the following:

> The *elements* of defamation require the plaintiff to prove that a statement was false * * *.

*Rouse,* 520 N.W.2d at 410 (emphasis added). The same authorities cited by the court for the abrogation of the common law falsity rule (cases such as *Lewis v. Equitable Life Assurance Soc'y of the United States,* 389 N.W.2d 876 (Minn.1986), and *Stuempges* ), simultaneously discuss with approval the *truth defense* to defamation. The common law recognized that truth is an absolute *defense* to a defamation claim. *Thompson v. Pioneer Press Co.,* 37 Minn. 285, 294, 33 N.W. 856, 861–62 (1887), *Palmer v. Smith,* 21 Minn. 419, 420–21 (1875); *see also Jadwin,* 390 N.W.2d at 440 (citing *Jadwin,* 367 N.W.2d at 480; Restatement (Second) of Torts § 581A cmt. b (1977)). Overlooked is the fact that the common law truth defense is historically coordinate with the common law presumption of falsity. Mere recitation of the defamation *elements* does not determine the issue of whether the common law presumption remains viable. Elements are those facts that must be proved in order for a claimant to prevail. Elements say nothing about the manner of proving falsity, that is, whether the defamatory statement is presumed false and the defendant must prove truth, as in the common law rule, or whether a plaintiff must prove the defamatory statement false in the first instance. The court cites and characterizes the recent supreme court opinion in *Ferrell v. Cross,* 557 N.W.2d 560, 565 (Minn. 1997), as "placing [the] burden of proving falsity on plaintiff." But that case does not even discuss the common law presumption of falsity, a sublety capable of existence within the court's characterization.

The reality of the current confusion is apparent from the commentary to 4 *Minnesota Practice,* CIVJIG 704 (Supp.1996). Among other things, the committee stated:

> In light of these questions concerning the burden of proof on the truth issue in cases that do not involve public officials, figures, or issues, and pending further elucidation on the issue by the Minnesota Supreme Court, the Committee has not followed the eighth circuit's decision in *Jeffries* [which holds that the plaintiff must prove falsity contrary to the common law presumption].

Experienced trial judges and practitioners appreciate that defamation law is complex and associated trials are time-consuming and expensive; regrettably, this continues to be exacerbated by confusion in the law.

Because my research has produced no clear indication from the Minnesota Supreme Court that the common law presumption of falsity has been rejected and replaced in private plaintiff/private concern defamation cases, the common law rule remains the most current solid authority. I have difficulty assuming that the supreme court would abrogate an ancient common law precedent without saying so. I therefore read caselaw language describing what a plaintiff must prove as simply a generalized articulation of the elements of defamation that must be proved to enable recovery.

Accordingly, I would reverse the district court on the defamation issue because the district court jury instructions did not accommodate the common law presumption of falsity; I would then continue on to decide the issues raised in respondent's alternative notice of review, to-wit, qualified privilege and punitive damages. I otherwise concur in the opinion of the court.