Thomas E. JADWIN, et al., Appellants,

v.

The MINNEAPOLIS STAR AND TRIBUNE CO., et al., Respondents.

No. C1–86–215.

Court of Appeals of Minnesota.

July 22, 1986.

Allan D. Barnard, Tammy L. Pust, Best & Flanagan, Minneapolis, for appellants.

Patricia A. Hirl, Norton L. Armour, Minneapolis, for respondents.

Heard, considered and decided by NIERENGARTEN, P.J., and LANSING and HUSPENI, JJ.

## OPINION

LANSING, Judge.

Thomas Jadwin appeals the trial court's judgment that he raised no genuine issue of material fact as to the falsity of defamatory statements in a newspaper article published by the respondent. We reverse and remand for trial.

## FACTS

Thomas Jadwin was the president and director of Tax Exempt Bond Fund for Minnesotans, Inc., and the promoter, president and principal shareholder of Minnesota Fund Management, Inc. (MFM), the fund adviser. He organized these corporations for the purpose of offering to the public a "double tax-exempt no-load bond mutual fund." He and his corporate entities brought this action against the Minneapolis Star and Tribune Co., alleging they had been libeled in an article written by Joe Blade and published on March 5, 1980 (contained in an appendix to this opinion). The article appeared during the impoundment period of the bond fund. Allegedly as a result, the fund did not raise the minimum capitalization of $1 million required by state law. *See* Minn.R. 2875.3940 (1983).

After extensive discovery, the defendant moved for summary judgment. The trial court granted the motion, ruling that a private-figure plaintiff must prove the defendant acted with actual malice, that is,

with willful or reckless disregard for the truth.

On appeal, the supreme court affirmed the finding that Jadwin was a private figure. *Jadwin v. Minneapolis Star and Tribune Co.*, 367 N.W.2d 476, 485–86 (Minn.1985). However, the court held that a private plaintiff does not have to prove actual malice, but may recover actual damages for a defamatory publication "upon proof that the defendant knew or in the exercise of reasonable care should have known that the defamatory publication was false." *Id.* at 491. The court also held that the corporate plaintiffs must prove actual malice when alleging defamation in matters of legitimate public interest. *Id.* at 487. The court found no evidence of actual malice and affirmed the grant of summary judgment against the corporations. *Id.* at 488.

On remand, the defendants again moved for summary judgment on Jadwin's individual claims, arguing there was insufficient evidence to create a genuine issue of material fact on the falsity of the article, its defamatory impact, the defendants' negligence, and damages. The trial court granted their motion on the basis that there were no facts in the record to substantiate Jadwin's allegation of falsity. Jadwin appeals from the judgment.

## ISSUE

Did Jadwin raise a genuine issue of material fact as to the falsity of any defamatory statements contained in the article?

## ANALYSIS

At common law, a defamatory statement was presumed to be false. Truth was an absolute, affirmative defense. *See Jadwin*, 367 N.W.2d at 480; *Restatement (Second) of Torts* § 581A and comment b (1977). The United States Supreme Court constitutionalized the common law in *New York Times v. Sullivan*, 376 U.S. 254, 84

S.Ct. 710, 11 L.Ed.2d 686 (1964), when it held that a public official must prove "that the [defamatory] statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard for whether it was false or not." *Id.* 376 U.S. at 279–80, 84 S.Ct. at 725–26. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the court addressed the issue in the context of a private plaintiff and again implied that proof of falsity was an essential element by holding that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher of defamatory falsehood injurious to a private individual." *Id.* 418 U.S. at 346–47, 94 S.Ct. at 3010. This standard requires a determination that the statement involved is both false and defamatory.[1] *See generally* Franklin & Bussell, *The Plaintiff's Burden in Defamation: Awareness and Falsity*, 25 Wm. and Mary L.Rev. 825, 851–69 (1984).

In *Philadelphia Newspapers, Inc. v. Hepps*, —— U.S. ——, 106 S.Ct. 1558, 89 L.Ed.2d 783 (April 21, 1986), the Supreme Court expressly ruled that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern." Thus, the court ruled that a private-figure plaintiff has the burden of showing the speech at issue is false before recovering damages for defamation from a media defendant. The court specifically reserved the issue of the quantity of the proof of falsity that a private-figure plaintiff must present to recover damages. *See id.* at n. 4.

■ The issue of proof of falsity is central to this case because the trial court granted summary judgment on the basis that Jadwin failed to show that any of the statements in the article were false. To review this ruling, we must inquire into

---

1. In Minnesota, the courts presumed that the burden of proving falsity shifted to the plaintiff after *Gertz. See Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980) (elements of a defamation action are publication, falsity, and defamatory meaning). The parties litigated this case at trial and on appeal as if Jadwin bore the burden of proving falsity.

which statements may be considered false for purposes of libel law. We initially acknowledge that only false and defamatory statements of fact are actionable; "there is no such thing as a false idea." *Gertz*, 418 U.S. at 339–40, 94 S.Ct. at 3006–07. *See generally Ollman v. Evans*, 750 F.2d 970, 974–84 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Expressions of opinion, rhetoric, and figurative language are generally not actionable if, in context, the audience would understand the statement is not a representation of fact. *See Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974); *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 13–14, 90 S.Ct. 1537, 1541–42, 26 L.Ed.2d 6 (1970).

■ Second, the plaintiff cannot succeed in meeting the burden of proving falsity by showing only that the statement is not literally true in every detail. If the statement is true in substance, inaccuracies of expression or detail are immaterial. *See Stuempges v. Parke Davis*, 297 N.W.2d 252, 255–56 (Minn.1980); Restatement (Second) of Torts § 581A comment f; *Williams v. WCAU–TV*, 555 F.Supp. 198, 202 (E.D. Pa.1983). "A statement is substantially accurate if its gist or sting is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Williams v. WCAU–TV*, 555 F.Supp. at 202; *see also Prosser and Keeton on the Law of Torts* § 116, at 842 (W. Keeton ed. 5th ed. 1984). Where there is no dispute as to the underlying facts, the question of whether a statement is substantially accurate is one of law for the court. *Williams v. WCAU–TV*, 555 F.Supp. at 203. Our determination requires a review of the specific allegations.

■ 1. The headline reads, "New city mutual fund stages one-man show." Calling the fund a "one-man show" is not a false statement of fact but simply a figurative description. Similarly, calling it a "city" mutual fund is not a false statement of fact but a word describing Jadwin's location. The newspaper's choice of descriptive words in these statements is not actionable.

2. "In registering the fund for sale to the public, Jadwin was asked twice by the securities division of the Minnesota Commerce Department to withdraw his application because of his lack of experience in mutual fund management.

But the fund was registered after Jadwin met the security division's requirements by agreeing to hire an experienced bond broker to advise him and to keep the fund's expenses within legal limits."

■ Newspapers have a qualified privilege when making a fair and accurate report of public records. *See Time, Inc. v. Firestone*, 424 U.S. 448, 455–57, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154 (1976); *Nixon v. Dispatch Printing Co.*, 101 Minn. 309, 112 N.W. 258 (1907). The newspaper contends this is an accurate report of documents contained in the fund's registration file. Jadwin claims the statement is false because the securities division was concerned about his lack of experience in the bond industry, not in management of mutual funds.

The correspondence between Jadwin and Jeffrey Wartchow, the deputy commissioner of securities, shows that Wartchow initially objected to registration of the fund because "no officer of the fund has any experience of the kind that would qualify them to manage a fund of this nature" and the fund's investment adviser was not qualified to rate bonds. Wartchow later specified that someone with practical experience in the purchase, sale, and rating of municipal bonds would have to be affiliated with the fund. Jadwin consequently retained Howard Marcotte, president of Cronin & Marcotte, to advise the fund on a consulting basis. Marcotte became a director and officer of the bond fund and a consultant to MFM, the investment adviser. This arrangement satisfied Wartchow.

We conclude that the statement that Wartchow was concerned about Jadwin's inexperience is privileged because it is a

fair and accurate summary of the correspondence between Wartchow and Jadwin. The statement is also substantially true.

In addition, Wartchow objected to Jadwin's failure to disclose in the prospectus how the fund adviser would reimburse the fund for overpayment of fees. Jadwin wrote back, detailing the method he had adopted. Wartchow found this explanation satisfactory, but asked that the procedure be clarified in the prospectus. The prospectus was changed to include the reimbursement method, and ultimately the offering was accepted for registration.

Technically, the issue here was one of disclosure rather than approval of the reimbursement method. However, the inclusion of false or misleading statements in the prospectus may result in civil or criminal liability. *See, e.g.,* 15 U.S.C. §§ 77*l*, 77q; Minn.Stat. §§ 80A.17, 80A.22–23. By disclosing the reimbursement method he planned to use, Jadwin became bound to use it.

■ The statement that he agreed to keep expenses within legal limits is privileged as a fair summary of the correspondence and is also substantially true. Courts allow reporters some leeway in accuracy when describing legal issues to the public.[2]

3. "[E]xpenses for the fund, at least in its early stages, are expected to bump up against Minnesota's 2 percent limit."

■ Jadwin claims this statement is fabricated. The newspaper indicated in discovery that these expectations, though not attributed in the article, are Wartchow's. The newspaper submitted an affidavit from Wartchow, stating "After a review of the materials submitted by Jadwin in support of registration, he became concerned that the expenses would "bump up" against the

2 percent limit authorized by the State of Minnesota." This is a statement of opinion that is neither actionable nor defamatory. *See Southard v. Forbes,* 588 F.2d at 144 (article suggesting that a classic car dealer was puffing the value of investment in classic cars may be unfavorable commercial publicity but is not defamatory). As in *Forbes,* the message here was caveat emptor to potential investors. There is nothing defamatory about this message.

4. "Jadwin also says that his fund is unique. Technically, that is true. But there are other similar investments."

By its own terms, the article acknowledges that other funds are similar but not identical. It is a true statement.

5. In addition, the article makes a number of references to Jadwin being the "sole employee" of the fund. Jadwin says this statement leads financially knowledgeable readers to the false conclusion that he is violating securities laws because mutual funds are not allowed to have employees in addition to management expenses. He also claims the statements that he was soliciting investments in the fund lead to the false conclusion that he violated securities laws.

■ In construing the language of the alleged libel, courts must give the words their obvious and natural meaning "unless they are alleged to have been used and understood in a different sense." *Jones v. Monico,* 276 Minn. 371, 374, 150 N.W.2d 213, 215 (1967) (cited in *Church of Scientology of Minnesota v. Minnesota State Medical Association Foundation,* 264 N.W.2d 152, 155 (Minn.1978)). Jadwin's construction requires conclusions that would not be drawn by the ordinary newspaper reader. *See Southard v. Forbes,* 588 F.2d at 144. In their normal sense these words would not lead a reader

**2.** *See Orr v. Argus Press Co.,* 586 F.2d 1108, 1112–113 (6th Cir.1978) (an article using the words "fraud," "swindle," and "phony" to describe a developer indicted for securities violations is accurate and appropriate); *Southard v. Forbes, Inc.,* 588 F.2d 140, 144 (5th Cir.1979) (a reader of *Forbes* magazine would not reasonably draw the same conclusions as legal experts in securities law). *See also Hovey v. Iowa State,* 372 N.W.2d 253, 255 (Iowa 1985) ("technical errors in legal terminology * * * are of no legal consequence); *Ricci v. Venture Magazine, Inc.,* 574 F.Supp. 1563, 1567 (D.Mass.1983) (courts are to apply a "common sense standard of expected lay interpretation of media reports of trials, rather than inquiring whether a report was strictly correct in defining legal charges and describing legal rulings").

to the conclusion that Jadwin violated the law.

6. "In a letter to the state securities division, Jadwin said of his government jobs: 'I have been appointed by two presidents (one Republican and one Democrat) to financial and management positions.'

When interviewed, Jadwin said he meant that he had worked in the government during the administrations of two presidents."

Jadwin made the quoted statement in a letter to Wartchow. He denies making the corrective statement given by the reporter. Jadwin said in a deposition that when the reporter asked him to explain the statement, he said that when he worked for the National Endowment for the Humanities, he served "in a Presidential appointed position, a schedule C position, meaning you serve at the pleasure of the president," and when he worked for the National Center for Housing Management, created by an executive order, he was hired by an administration committee appointed by the president.

Up to this point the article had focused on Jadwin's lack of experience, which is not an aspersion of character. Jadwin had not been involved in managing a mutual fund, and Wartchow was concerned about it. Jadwin had, however, retained experienced legal counsel and a nationally known accounting firm and had complied with all of the requirements of federal and state securities laws and regulations. Although these facts did not appear in the article, the characterization of inexperience is permissible based on the contents of the registration file. In attributing to Jadwin the corrective statement, "Jadwin said he meant he had worked in the government during the administrations of two presidents," the article for the first time casts aspersions on Jadwin's character.

■ The defamatory character of any particular statement must be construed in the context of the article as a whole. *Tawney v. Simonson, Whitcomb & Hurley Co.*, 109 Minn. 341, 352, 124 N.W. 229, 233 (1909). A defamatory statement is one that tends to harm the plaintiff's reputation and lower him in the estimation of the community. *Stuempges v. Parke, Davis*, 297 N.W.2d at 255.

■ The article suggests significance in Jadwin's lack of employees, use of embossed paper, and use of the address of a secretarial and answering service instead of office space. Accompanying the article was a large photograph of the secretarial service's office door, on which was superimposed the first page of the prospectus, emphasizing that the addresses were the same. The obvious inference is that Jadwin was attempting to create an impression of substance where there was none. In the context of this article, the corrective statement attributed to Jadwin is defamatory because it further implies that Jadwin was attempting to create a false impression of substance by misrepresenting the circumstances of his federal appointments.

Any remaining public confidence in the enterprise, to which Jadwin had devoted years of time and $32,000 of his own money, would have been unlikely.

■ Respondents contend that the statement Jadwin now claims to have made has exactly the same meaning as the one published. We cannot say the ordinary reader would have the same reaction to Jadwin's version of the facts as to the statement contained in the article. "[T]he justification * * * must * * * be as broad as the defamatory accusation." *Thompson v. Pioneer-Press Co.*, 37 Minn. 285, 294, 33 N.W. 856, 861 (1887). This is a purely factual issue. If the statement is false, a reasonable jury could find the respondents were negligent and Jadwin suffered actual damages. We reverse the trial court's grant of summary judgment.

## DECISION

The trial court erred in granting summary judgment because there is a material factual issue as to whether the article defamed Jadwin by falsely implying he had substantially misrepresented his background in a letter to the deputy commissioner of securities.

Reversed and remanded.

NIERENGARTEN, Judge (dissenting).

I respectfully dissent. As the majority acknowledges, a good portion of the article focused on Jadwin's lack of experience in the bond industry, particularly in the management of mutual funds. Such a focus does not constitute an aspersion of character, as the majority correctly concludes.

The majority errs, however, in holding that the alleged corrective statement attributed to Jadwin is defamatory because coupled with the article's observations regarding the lack of employees, the embossed paper, the address, and the accompanying photograph it creates "a false impression of substance by misrepresenting the circumstances of his federal appointments." In determining the meaning and effect of an article, the writing must be construed as a whole, without placing undue emphasis on a portion of the writing or taking any word or phrase out of context. *Morey v. Barnes*, 212 Minn. 153, 156, 2 N.W.2d 829, 831 (1942); *Tawney v. Simonson, Whitcomb & Hurley Co.*, 109 Minn. 341, 352, 124 N.W. 229, 233 (1909). From my reading of the entire article, I am not left with the impression that the corrective statement attributed to Jadwin is defamatory. In my opinion, the majority places undue emphasis on the alleged corrective statement.

The alleged "corrective statement" does not cast an aspersion on Jadwin's character, at least not to the degree of raising the article to the level of defamation of character. This ground for reversal is too selective when construing it in the context of the article as a whole. I would affirm the judgment of the trial court.

## APPENDIX

### NEW CITY MUTUAL FUND STAGES ONE–MAN SHOW

#### By JOE BLADE

##### Minneapolis Star Staff Writer

A new mutual fund has been started here with a single employee who has no mutual fund experience, corporate directors who also lack experience and an address that actually is the office of a secretarial service.

The fund is called Tax Exempt Bond Fund for Minnesotans Inc. Its prospectus says it will invest 80 percent or more of its money in Minnesota tax-exempt bonds. That would make that proportion of its income exempt from federal and state income taxes for Minnesota residents.

. Its founder, president and sole employee is Thomas Jadwin, 35. Jadwin is soliciting investments in the fund from his apartment at 1910 Burns Ave. in St. Paul.

Similar funds designed to pass interest along to investors have been growing increasingly popular as interest rates have soared. New investment vehicles have been springing up to take advantage of the record rates.

In registering the fund for sale to the public, Jadwin was asked twice by the securities division of the Minnesota Commerce Department to withdraw his application because of his lack of experience in mutual fund management.

But the fund was registered after Jadwin met the security division's requirements by agreeing to hire an experienced bond broker to advise him and to keep the fund's expenses within legal limits.

The fund has no office at present. But its printed materials, its advertisements and its embossed stationery give its address as Suite 1414 in the Soo Line Building in downtown Minneapolis.

In fact, Suite 1414 is occupied by Executive Secretary Ltd., a secretarial and telephone answering service that takes Jadwin's mail and answers his phone calls.

"It's a brand new company, and I need a mail drop," Jadwin said. He wanted a downtown Minneapolis telephone number he could use when he did open an office, he said.

Jeff Wartchow, deputy Minnesota securities commissioner, said that use of the address probably was legal. An attorney for the Securities and Exchange Commission in Washington, D.C., agreed.

The mutual fund went on sale Feb. 15 after having been registered with the state

securities division and the SEC. It will not begin operating unless $1 million of [the] shares are sold within 90 days.

Jadwin most recently was acting deputy director of a division of the National Endowment for the Humanities in Washington, D.C. He has been a consultant with two prestigious national consulting firms and financial manager of the government-created National Center for Housing Management.

In a letter to the state securities division, Jadwin said of his government jobs: "I have been appointed by two presidents (one Republican and one Democrat) to financial and management positions."

When interviewed, Jadwin said he meant that he had worked in the government during the administrations of two presidents.

The experienced bond broker Jadwin hired at Wartchow's insistence is Howard Marcotte, a partner in the Minneapolis bond firm of Cronin & Marcotte Inc. Marcotte agreed to advise Jadwin on bond purchases and to become a director. He is the only director with professional experience in the bond business.

Neither Marcotte nor Jadwin nor any of the other three directors has worked for a mutual fund. The latter three say they are personal friends of Jadwin and became directors at his request.

When asked if Jadwin was capable of making the investment decisions required, Marcotte replied:

"He will be, with me behind him."

Jadwin himself says:

"There are probably few people who have more knowledge of the operation of a mutual fund now than me." He has acquired that knowledge in registering his fund, he said, and in setting up its accounting and preparing its advertisements.

When asked how he would accumulate bonds for the fund, Jadwin said he would consult with Marcotte when money was available and then buy bonds. If they expected interest rates to rise or fall, Jadwin said, he could change the bonds in the mutual fund's portfolio.

Jadwin also says that his fund is unique. Technically, that is true. But there are other similar investments.

The income from several other bond mutual funds is exempt from federal—but not state—income taxes. And several brokerage houses sell "unit trusts" of Minnesota tax-exempt bonds, which are exempt from state and federal taxation.

A unit trust holds its bonds until they mature. An investor buys a share of that package of bonds. He gets income that includes proceeds from bonds that mature. The brokerage houses that issue unit trusts buy back shares at the current market price of the portfolio, so an investor is not locked in.

Jadwin's fund has no sales commission, or "load," a benefit for an investor. But expenses for the fund, at least in its early stages, are expected to bump up against Minnesota's 2 percent limit.

That means 2 percent of the fund's assets would be used for expenses and management fees each year. So if bonds in the fund paid 8 percent interest, an investor would actually get 6 percent, after deduction of fees and expenses.