# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3008

_____

Kerwyn Lykken; Esther Lykken,     *
                                        *

           Appellants,     *

                                          *     Appeal from the United States
     v.                                  *     District Court for the
                                          *     District of South Dakota.

Crystal Brady; Kevin Thom, Special     *
Administrator of the Michael Braley     *
Estate; Fred Devaney; Trevor Jones;     *
Kevin Thom; Mike Bucholz,     *
                                          *

           Appellees.     *

_____

Submitted: May 12, 2010
Filed: September 21, 2010

_____

Before RILEY, Chief Judge, JOHN R. GIBSON and MURPHY, Circuit Judges.

_____

RILEY, Chief Judge.

Pursuant to a valid warrant, law enforcement officers engaged in a large-scale search of Kerwyn Lykken's and Esther Lykken's (together, the Lykkens), Union County, South Dakota, farm. As the search was conducted, some of the Lykkens' livestock bolted through a fence, and Esther's pregnant cat gave birth. The search lasted four days, during which the livestock lost weight, Esther's stove was left on, and some of the kittens died. The Lykkens sued six of the officers under 42 U.S.C. § 1983,

asserting civil rights violations arising from the search. The district court[1] granted summary judgment to the officers on qualified immunity grounds, and the Lykkens appeal. We affirm.

## I.    BACKGROUND[2]

In 1971, two teenage women disappeared in rural Union County, South Dakota. In 2004, the South Dakota Attorney General's Office reopened an investigation into the case, and Agent Michael Braley[3] of the South Dakota Division of Criminal Investigation (DCI) was its lead investigator. David Lykken (David), an inmate at the South Dakota State Penitentiary, was a suspect in the investigation. In 1971, David lived on what is today his mother Esther's and his brother Kerwyn's property.

On August 20, 2004, Braley obtained a search warrant for the Lykken property. The parties agree there was probable cause for issuance of the warrant, which authorized searching the Lykkens' property for, among other things, the young women's bodies, car, and personal effects, including a graduation ring, a Timex watch, and various other clothing items and documents. The warrant was executed at around 10:00 a.m. on August 24, 2004, by as many as 50 law enforcement officers, including Braley, DCI Agents Fred Devaney, Trevor Jones, and Kevin Thom, Vermillion Police Department Detective Crystal Brady, and Union County Deputy Sheriff Mike Bucholz (collectively, appellees).

---

[1]The Honorable Karen E. Schreier, Chief Judge, United States District Court for the District of South Dakota.

[2]The facts are related in the light most favorable to the Lykkens. See Sitzes v. City of W. Memphis Ark., 606 F.3d 461, 464 (8th Cir. 2010).

[3]Braley died during the pendency of this litigation. Kevin Thom, the special administrator of Braley's estate, therefore replaced Braley as a defendant. Because Thom was himself a defendant in the case, the district court elected to refer to Thom, when in his capacity as Braley's administrator, as "Braley." We also adopt this practice.

When the officers arrived, the Lykkens were moving cattle from one side of a highway bisecting their property to the other side with the help of some relatives. Bucholz and Braley took Kerwyn away from the other family members and Brady and Devaney took Esther away. These four officers stopped the Lykkens from herding their cattle. No officer made any effort to round up the cattle. Bucholz told Kerwyn the neighbors would care for them, but made no arrangements for anyone to do so. Spooked by the officers, the cattle recrossed the highway, broke a fence, and ran into a corn field, where they stayed unattended for over a week, causing damage.

After Kerwyn's initial interview, Braley and Bucholz excluded Kerwyn from the farm and told Kerwyn they wanted to talk with him at the Union County Courthouse in Elk Point, South Dakota. In Elk Point, Braley and Bucholz questioned Kerwyn, and made criminal accusations against him. Braley and Bucholz insinuated Kerwyn knew about the 1971 disappearances, and Bucholz also made negative comments about Kerwyn's late father and brother. At Bucholz's request, Kerwyn then drove to Vermillion, South Dakota, and took a polygraph examination. Kerwyn was interrogated until about 7:00 p.m., when he broke off the interview. Kerwyn then returned to the farm to tend to his cattle, but Bucholz told him to leave the farm.

Brady and Devaney questioned Esther. Brady made 84-year-old Esther show Brady around the property riding in the golf cart Esther uses for mobility. Brady and Devaney then continued interrogating Esther inside her house. The district court recited the following:

> Brady and Devaney accused Esther of hiding the truth about crimes committed by her husband and sons and of assisting her sons in the rape, kidnapping, and murder of the two girls in 1971. Esther claims that Brady spoke too close to Esther's face, asked Esther a lot of questions, raised her voice, and used an accusatory tone of voice. Neither Brady nor Devaney ever physically touched or restrained Esther. . . .

-3-

At some point after questioning Esther, Brady and Devaney escorted Esther outside and told her to sit on a bench in her yard. Esther claims that Brady and Devaney sat with her on the bench for awhile [sic], but left her at some point. Esther testified that she was permitted to stand and walk around and to re-enter the house to use the bathroom. Esther also testified that she did not re-enter the house to eat lunch or dinner, and she does not remember if she was allowed to get a glass of water during the day. Brady and Devaney did not allow Esther to enter her house during the search to cook, turn off the stove, or care for her cats (one of which was pregnant) while officers conducted the search. . . .

It is undisputed that around 8 p.m., an officer (alleged to be Thom) ordered Esther to enter the house and said to her, "You and Kerwyn get your act together tonight. You confess, and when we come in the morning, why, we'll have your confession and we'll be out of here immediately. There won't be anymore [sic] digging. . . ."

Defendants excluded Esther and Kerwyn from the Lykken property until noon on August 28, 2004. When Esther returned to her home after defendants were finished searching, she found her home in a terrible mess. Her stove was filthy. Her cat had given birth, and several kittens died. Also, one of Esther's refrigerators or freezers was unplugged by unidentified officers, causing the food to spoil and produce a foul odor.

Lykken v. Brady, No. Civ. 07-4020, 2009 WL 2244177, at *2-3 (D.S.D. July 27, 2009) (internal citations omitted). Other search-related damage was also alleged by the Lykkens, such as failing properly to fill large holes dug during the search, and damage to Kerwyn's house caused by the searchers. Two further search warrants were eventually issued for the Lykken property, a November 16, 2004 search involved more digging of large holes in search of the car, and a February 5, 2007 search for a Bible and some writings. None of the items were ever found.

On February 21, 2007, the Lykkens sued appellees in the district court, pursuant to 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments by

unreasonably searching their property and seizing their persons, and also alleging state law claims for conversion, trespass, breach of contract, and emotional distress. The district court granted appellees summary judgment as to all the § 1983 claims on qualified immunity grounds and declined to exercise jurisdiction over the pendant state law claims. The Lykkens limit their appeal to the district court's rulings on Kerwyn's unreasonable search and Esther's unreasonable seizure claims related to the August 24, 2004 search.

## II.   DISCUSSION
### A.   Standard of Review

"We review the district court's grant of summary judgment de novo." See, e.g., Cole v. Homier Dist. Co., 599 F.3d 856, 864 (8th Cir. 2010) (citing Reynolds v. RehabCare Group E., Inc., 591 F.3d 1030, 1032 (8th Cir. 2010)). "Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. (quoting Myers v. Lutsen Mtns. Corp., 587 F.3d 891, 893 (8th Cir. 2009)).

### B.   Qualified Immunity

"Qualified immunity protects '[g]overnment officials performing discretionary functions.'" Rush v. Perryman, 579 F.3d 908, 913 (8th Cir. 2009) (quoting Bankhead v. Knickrehm, 360 F.3d 839, 843 (8th Cir. 2004)). "In assessing a claim of qualified immunity, we . . . ask whether the plaintiff's allegations establish a violation of the Constitution." Sherbrooke v. City of Pelican Rapids, 513 F.3d 809, 813 (8th Cir. 2008) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). "If so, then we 'ask whether the right was clearly established' at the time of the violation." Id. "To defeat a claim of qualified immunity, the contours of an alleged constitutional right must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Smook v. Minnehaha County, 457 F.3d 806, 813 (8th Cir. 2006) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Although it is often "the better

approach . . . to determine the right before determining whether it was previously established with clarity," County of Sacramento v. Lewis, 523 U.S. 833, 841, n.5 (1998), we may address whether the right at issue was clearly established first in appropriate cases, see Pearson v. Callahan, 555 U.S. ___, ___, 129 S. Ct. 808, 818 (2009).

### C.    The Lykkens' Unreasonable Search Claim

The Lykkens assert the August 2004 search violated their Fourth and Fourteenth Amendment rights to be free from unreasonable searches. The district court held the search was unreasonable, but nevertheless granted appellees summary judgment because it held the right to be free from the type of unnecessary destruction at issue in the case was not clearly established at the time of the search. The district court found the manner of the search unreasonable because the appellees refused to allow: (1) the Lykkens to round up their cattle, (2) the Lykkens to care for their cattle during the four-day search, (3) Esther to turn off the stove, and (4) Esther to check on the pregnant cat and, later, the newborn kittens. The thrust of the district court's ruling is that these destructive acts were not necessary to execute the search and were therefore unreasonable.

Courts may properly probe the manner in which law enforcement executes a warrant to ensure compliance with the Constitution. See Hummel-Jones v. Strope, 25 F.3d 647, 650 (8th Cir. 1994) ("The manner in which a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness."). Although the Fourth Amendment protects against unnecessarily destructive searches and seizures, see Ginter v. Stallcup, 869 F.2d 384, 388 (8th Cir. 1989) (per curiam), the execution of a search warrant does occasionally require damage to property, see Dalia v. United States, 441 U.S. 238, 258 (1979). We review appellees' conduct for objective reasonableness, ignoring appellees' subjective intent. See Anderson, 483 U.S. at 641 (applying objective standard to qualified immunity analysis).

No constitutional violation is to be found with respect to the Lykkens' cattle. When the appellees appeared at the Lykken farm, the cattle were spooked, bolted, and broke through a fence. It was the arrival of the officers and initial detention of the Lykkens that caused the cattle to bolt—and we find it obvious that the officers' arrival at the scene was necessary in order to execute the search warrant. The district court conflates the appellees' necessary arrival with their later refusals "to allow Kerwyn to round up the cattle that had run into the corn field." But as the Lykkens conceded at oral argument, "The actual destruction occurred immediately." The Lykkens argue the enforced abandonment of their cattle in the corn field increased the amount of their damages, but they do not suggest the abandonment constitutes a distinct constitutional claim.[4] Because the damage was caused by the very arrival of the warrant executing officers, a manifestly necessary part of carrying out the search, there was no constitutional violation respecting the cattle.

Similarly, denying Esther's entry into her house to turn off the stove and check on her cat would not appear unreasonable to an officer at the scene. While we sympathize with Esther's feelings about her cats,[5] we cannot agree with the district

---

[4]Because the Lykkens do not ground their constitutional violation theory on the abandonment of the cattle, the district court's citation of White v. Rochford, 592 F.2d 381, 382, 384 (7th Cir. 1979) (finding due process violation when officers left three children in an abandoned automobile on the side of a busy freeway) is inapposite. The district court's suggestion the appellees may have exposed the Lykkens to civil or criminal liability for the inhumane treatment of animals in violation of S.D. Codified Law § 40-1-27 and §§ 40-1-2.3 to -2.4 is similarly irrelevant.

[5]There is no suggestion here that any of the appellees intentionally destroyed Esther's kittens. Pregnant cats have given birth to kittens without human intervention throughout the ages. See Nahrstedt v. Lakeside Village Condo. Assn., 878 P.2d 1275, 1294 n.8 (Cal. 1994) (noting some ancient Egyptians worshiped the cat goddess Bastet). The unfortunate death of Esther's kittens could not have been foreseen by a reasonable officer as the consequence of denying Esther entry to her home. Under these circumstances, it is not a constitutional violation to deprive a cat owner of

court "that Brady and Devaney's refusal to allow Esther to enter the house for the amount of time it would have taken to turn off the stove and check on her cats was unnecessary and unreasonable." Perhaps denying Esther entry into her house could be considered unreasonable if the officers were searching only for large objects which could not be secreted within the house. But the search warrant demanded a search for more than just the missing vehicle. The warrant also identified small objects, such as a ring, a watch, photographs, and papers, which could potentially be removed, destroyed, or hidden. Moreover, in the circumstances of this case, the fact that probable cause existed for the search could lead a reasonable officer to suspect the occupants of the house might attempt to conceal the objects of the search if the Lykkens were allowed unfettered access to the house. Denying Esther access to her house during the pendency of the search was therefore not unreasonable.

Because we conclude the appellees' search did not violate the Lykkens' constitutional rights, we do not reach the issue of whether the right at issue was clearly established at the time of the search.

### D.    Esther's Unreasonable Seizure Claim

Esther claims she was unreasonably seized during the August 2004 search. The district court found "Esther was unquestionably seized within the meaning of the Fourth Amendment when [appellees] arrived on the Lykken property the morning of August 24, 2004, and Brady and Devaney separated her from her family members." Brady made Esther show Brady around the property in the golf cart Esther used for mobility, and thereafter Brady and Devaney questioned Esther. The district court found, after the questioning, Brady and Devaney escorted Esther outside and told her to sit on a bench in the yard. The district court found from the time she was seized to the time she sat on the bench, Esther's detention was justified by Michigan v.

---

human assistance for her pregnant cat and later the new kittens.

Summers, 452 U.S. 692, 705 (1981), which permits law enforcement officers to detain a person while a search warrant for contraband is executed on his or her property.

In a more recent case applying Summers, Muehler v. Mena, 544 U.S. 93, 98 (2005), the Supreme Court referred to police "authority to detain incident to a search" as "categorical," and not depending "on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" Mena expressly allows the use of force to carry out a Summers detention. Id. at 98-99. The Mena Court concluded the additional force used, a 2- to 3-hour detention in handcuffs, was justified by the inherently dangerous circumstances of the search. Id. at 99. Guarded by only two officers, Mena and three others were held in handcuffs in the garage of a gang house while it was searched for dangerous weapons. Id. The Court found the officers' interest in safety in such an inherently dangerous environment justified the level of force used in that case. Id. at 100. However, the Mena Court also analogized the search in that case to a dog sniff performed in Illinois v. Caballes, 543 U.S. 405 (2005), and noted "that a lawful seizure 'can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" Mena, 544 U.S. at 101. In view of the Supreme Court's categorical approach, and the relatively short time period involved in Esther's case,[6] we agree with the district court that, regarding the period between appellees' arrival and Esther's placement on the bench, her detention was plainly permissible under Summers.

The district court next noted what it considered a potential factual dispute regarding "whether Esther was still being seized within the meaning of the Fourth Amendment" after she was left sitting on the bench. The court noticed "Esther has

---

[6]The record is not precise on this point. The officers arrived at the Lykken farm around 10 a.m., and Esther suggests she was outside beginning at approximately 10:30 a.m. In the light most favorable to the Lykkens, it is fair to conclude this initial period lasted less than an hour.

provided conflicting testimony on whether she was free to leave the Lykken property" at this point. More specifically, at her deposition, Esther testified:

> Q. During any of the searches you have said that during some of them you weren't allowed to go in your house. Were you ever told you couldn't leave the property?

> A. No.

> Q. You were told you couldn't go certain places on the property, but not told you couldn't leave.

> A. No, I was not told I couldn't leave. But why would I leave home? That thought never entered my mind, that I would have left, no.

Later, in her response to the appellees' motions for summary judgment, Esther swore in an affidavit that, "After I walked around the farm with them, I was told that I had to remain at the farm. I was told to stay outside of my home, which I did from approximately 10:30 AM through 8:15 PM."

The district court found it "need not resolve Esther's conflicting testimony because even if the seizure of Esther continued from the time Brady and Devaney escorted her outside until around 8 p.m. when another officer ordered her to leave the Lykken property, this seizure meets the reasonableness requirement of the Fourth Amendment." The district court employed a balancing test pursuant to Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)) ("[W]hether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."), weighing the government's "strong" interests in having Esther open locked doors and safes on the Lykken property during the search

and providing other assistance, against Esther's "slight" interest in her freedom for at least nine hours.  The district court concluded Esther's seizure was not unreasonable.

We agree Esther's unreasonable seizure claim was properly dismissed, but we arrive at this conclusion by a different route.  In Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365 (8th Cir. 1983), this court held where a party creates an issue of fact by filing an affidavit contradicting earlier testimony in order to avoid summary judgment, the party raises a "sham issue of fact instead of a genuine one." One possible exception to this rule is where "the party did not file an inconsistent affidavit for the purpose of circumventing Rule 56." Id. at 1364.  This may occur, for example, when the affidavit merely explains aspects of the prior testimony, or when the deposition resulted from confusion on the deponent's part requiring explanation. Id. at 1365.  Neither of these possible exceptions are present here.  Esther's affidavit does not attempt to explain her deposition testimony—it merely contradicts it.  Upon our careful review of the transcript of Esther's deposition, we do not detect any confusion in Esther's deposition testimony.  To the contrary, Esther's testimony is quite clear, she responds to questioning in detail, and Esther maintains a vivid recollection of the day of the search.

Because we conclude Esther's summary judgment saving affidavit should be ignored to the extent it conflicts with her prior deposition testimony, it is clear she was not in custody from the time she sat on the bench until she was ordered to leave. Because appellees were justified in initially detaining Esther pursuant to Summers, and she was thereafter free to leave, Esther's brief detention was not an unreasonable intrusion upon her Fourth Amendment rights.

## III.   CONCLUSION

We affirm the district court's judgment.

_____

-11-