# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1381

_____

| | | |
|---|---|---|
| Paul C. Stepnes, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Peter Ritschel, individual capacity, | * | |
| | * | Appeal from the United |
| Defendant-Appellee, | * | States District Court for |
| | * | the District of Minnesota. |
| Jane Moore, | * | |
| | * | |
| Defendant, | * | |
| | * | |
| City of Minneapolis; CBS | * | |
| Broadcasting, Inc., foreign corporation; | * | |
| Esme Murphy, individual, | * | |
| | * | |
| Defendants-Appellees. | * | |

_____

Submitted: November 15, 2011
Filed:  December 9, 2011

_____

Before WOLLMAN, MURPHY, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Minneapolis Police Sergeant Peter Ritschel arrested Paul Stepnes without a warrant for running a contest which allegedly violated Minnesota gambling laws.

Ritschel later obtained a search warrant and seized several items from the house where Stepnes was running the contest. Reporter Esme Murphy broadcast a news story about the contest and Stepnes's arrest on WCCO TV, a local CBS television station. Stepnes sued Ritschel and the city of Minneapolis under 42 U.S.C. § 1983, for civil rights violations during the arrest and search, and Murphy and CBS for defamation. Both sides moved for summary judgment. The district court[1] granted the motion of the defendants, and Stepnes appeals. We affirm.

I.

Stepnes, a home builder and developer, built a high priced home at 2857 Irving Avenue South in Minneapolis. He described it as a "new old house," meaning that it was designed to blend in with the surrounding established neighborhood while offering modern amenities, such as an elevator and a fully wired sound system.

Stepnes had financed the house with several loans. After his attempts to sell the home failed, it went into foreclosure and was sold in a February 2008 sheriff's sale to the bank which held most of the loans. In the spring of that year, Stepnes designed a contest to raise money to redeem the mortgage before the redemption deadline of September 26, 2008. See Minn. Stat. § 581.10 (governing redemption of mortgages). He called the original contest the "Big Dream House Giveaway." The contest website, www.2857irving.com, did not mention that the house was in foreclosure. Instead, it explained that the contest was designed to "take a negative situation and make something positive come out of it by raising enough money to pay off the mortgage of a housing shelter for women and children." No additional information or location was given about this housing shelter. Another section of the website stated that the goal of the contest was to raise $1.5 million for the Chester House Foundation, which

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

was described as an organization focused on providing affordable housing and reducing homelessness. The website did not reveal that the Chester House Foundation was a sole proprietorship run by Stepnes.

The original contest involved guessing the number of nuts, bolts, and screws (collectively referred to as fasteners) contained in a chest stored in the Irving Avenue house and pictured on the website. The website provided the dimensions of the chest but did not describe the ratio of each type of fastener. Nor did it reveal that also inside the chest were a plastic protection sheet and a cardboard box for stability. The contest was described on the website as one of "skill based on your mathematical and analytical skills." Stepnes promoted it by hiring a public relations agent. Several local newspapers ran stories about the contest.

Contestants were required to pay $20 for the opportunity to guess the number of fasteners in the chest. Entries could be purchased by mailing an application available online or going to the house in person. The contestant who guessed closest to the actual number of fasteners without exceeding it would win her choice of the house (valued at $1.8 million) or $1 million cash, provided that at least $5 million worth of tickets were sold. If less than $5 million in tickets were sold, the winner would receive 50% of the contest proceeds in excess of $1 million. The contest was to run until November 15, 2008. It also had a second component involving weekly drawings for small prizes, such as a microwave. The contest rules provided that all persons registering for the contest would be entered in the weekly drawings.

Prior to launching the original contest, Stepnes had contacted Tom Barrett, executive director of the Minnesota Gambling Control Board, to obtain advice about gambling laws. Barrett explained that illegal gambling consists of three elements: consideration, chance, and a prize. He advised Stepnes that guessing the number of fasteners in the chest would require analytical skill and thus remove the element of chance. For that reason the contest would not violate Minnesota's gambling laws.

On May 28, 2008, shortly after Stepnes launched the contest, a contractor who had a lien on the house phoned Sergeant Peter Ritschel and informed him that Stepnes might be conducting an illegal raffle at the house. The contractor directed Ritschel to the contest website. Sergeant Ritschel looked at the website and noted that it listed the name of a contestant who had won a microwave as part of the weekly drawing. Within hours of reviewing the website, Ritschel went to the house to investigate and to "get Mr. Ste[p]nes to cease his unlawful activities." The sergeant arrived at the house without a warrant during hours when it was open to the public. At the time Ritschel entered, Stepnes was in the back of the house with his public relations agent and a reporter from the <u>Southwest Journal</u>, a Minneapolis newspaper.

Ritschel told Stepnes that he believed an illegal gambling operation was occurring at the house. Stepnes responded that he had consulted with Barrett and State Senator Scott Dibble about his contest. When Stepnes refused to show Ritschel his identification, the officer arrested him and placed him in handcuffs. Stepnes claims that the handcuffs were so tight that they cut into his wrists. Ritschel transported Stepnes to jail and booked him under Minnesota Statute § 609.735, which prohibits wearing a mask in public. Police released Stepnes a few hours later.

The next day, Ritschel spoke with Barrett who explained that he had advised Stepnes that the contest as described was not gambling. Ritschel then asked whether the weekly drawing for a small prize was gambling. Barrett replied that Stepnes had not advised him that the contest would feature such a drawing. Because that drawing involved no skill or analysis, Barrett stated that "the element of the gamble is now present."

The same day as that conversation with Barrett, Sergeant Ritschel applied for and received a search warrant from a state judge for the Irving Avenue house. The warrant authorized the seizure of physical and electronic records related to an unlawful "Win this house" lottery, including documentation, notes, tickets, signage,

-4-

postings, computers, hard drives, and gambling related devices and paraphernalia. It also authorized seizure of records and documentation related to the Chester House Foundation. Ritschel and other officers from the Minneapolis Police Department executed the search warrant signed by a state judge that same day. During the search Stepnes was placed in the back of a squad car. The items seized included a sign posted on the front door, a newly purchased and unpackaged digital recorder, a camera with pictures of Stepnes's arrest, two computers, and the chest containing the fasteners. As the police removed the chest from the house, several fasteners spilled out.

The following day, Stepnes filed an emergency motion in state court seeking return of the seized items pursuant to Minnesota Statute § 626.04. Stepnes alleged that the police had prevented his counsel from viewing seized items to compare them to the search warrant and that the police had taken objects that Stepnes intended to use in a false arrest case against Ritschel and the city. The state judge held a hearing that very afternoon at which he questioned whether the police had exceeded the scope of the search warrant and had properly inventoried the seized items. The state court gave the Minneapolis defendants two days to prepare an inventory of the seized items before appearing at a second hearing.

At the second hearing, the state judge stated that the officers "went in [to the house] with the intent to shut the project down, and they did." He ordered the police to return most of the seized items, allowing them to keep one original copy of the contest documents and to take photographs of the other seized objects. The judge also ruled that the police could copy the hard drives of a computer seized by Ritschel but were not to view any information until he could conduct an in camera review for potential attorney client communications. After no further action by the state court in the next five months, Sergeant Ritschel directed the police crime examiner to review the information on the hard drives.

-5-

Following the May 29th search, Stepnes discontinued the original contest. Since he had never counted the number of fasteners in the chest, it was impossible to continue that contest because some of them had spilled out during the police action. Several area newspapers had covered the contest and mentioned Stepnes's contention that it was legal and that he had been falsely arrested. Around June 8, 2008, Stepnes started a second contest which required contestants to guess the number of fasteners contained in a glass aquarium. This contest did not feature a weekly prize drawing. Stepnes engaged a new public relations firm to manage publicity for it.

After starting the second contest, Stepnes learned that reporter Esme Murphy was planning on doing a story for CBS affiliate WCCO TV about the contests and his arrest. Stepnes's public relations firm advised him not to grant Murphy an interview. Stepnes nevertheless went ahead because he believed that Murphy "wanted to hear [his] side of things" and because "ratings were high on [that] station." Murphy interviewed Stepnes and his attorney on July 15, 2008, and the story aired that same evening. The broadcast also included interviews of Sergeant Ritschel and a contestant. It reported that Minneapolis police had said that Stepnes could be headed to jail, that the Chester House Foundation was not a registered charity in Minnesota, that the Irving Avenue house was in foreclosure, and that Stepnes believed his arrest was an "abuse of police power." The broadcast concluded by noting that the Minneapolis city attorney was continuing to investigate the situation.

Two days after the broadcast aired, Stepnes's public relations agency informed him that it would no longer represent him because he had disregarded their advice by granting Murphy an interview and because he had failed to disclose all the details concerning the house, including that it was in foreclosure. Within a week of Murphy's story, Stepnes decided to discontinue his second contest.

Stepnes filed suit against Ritschel and the city of Minneapolis pursuant to 42 U.S.C. § 1983 for Fourth Amendment violations, including false arrest, excessive

force, and unreasonable search and seizure. In the same complaint he also brought claims for defamation against Murphy and CBS based on her broadcast. Both sides moved for summary judgment. The district court granted summary judgment in favor of the defendants, after concluding that Stepnes had not demonstrated a Fourth Amendment violation to sustain his § 1983 claims against Sergeant Ritschel and the city. It also concluded that Stepnes's defamation claims failed because he was a limited purpose public figure and had not shown the required element of actual malice. Stepnes appeals the adverse grant of summary judgment on his claims.

II.

We first address Stepnes's § 1983 challenges. On appeal Stepnes renews his claim that Sergeant Ritschel and the city of Minneapolis are liable under § 1983 because Ritschel falsely arrested him, used excessive force, and executed an unlawful search in violation of his Fourth Amendment rights. We review a district court's grant of summary judgment de novo, "viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Stepnes's claims against Ritschel therefore stand or fall on whether qualified immunity attaches. In evaluating claims of qualified immunity, we examine (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) whether the constitutional right violated "was 'clearly established' at the time of defendant's alleged misconduct." Id. at 232 (citation omitted). A reviewing court may consider these factors in either order. Id. at 236. We find here that we can begin and end our analysis with the first factor.

Stepnes contends that Ritschel violated the Fourth Amendment by arresting him without a warrant. We have recognized that "[a] warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" Borgman v. Kedley, 646 F.3d 518, 522–23 (8th Cir. 2011) (citation omitted). Probable cause exists when "the facts and circumstances within the officers' knowledge . . . were sufficient to warrant a prudent person in believing that an offense has been committed." United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004). The focus must be on what the officer knew at the time of the arrest. See United States v. Kelly, 329 F.3d 624, 628 (8th Cir. 2003).

Because Ritschel arrested Stepnes for running an illegal lottery, the relevant inquiry is whether the sergeant had probable cause, or at least arguable probable cause, to believe that Stepnes was violating Minnesota gambling law by running an illegal lottery. A lottery is illegal if a prize is offered, the recipient is determined by chance, and participants must give consideration for the opportunity to win the prize. See Minn. Souvenir Milkcaps, LLC v. State, 687 N.W.2d 400, 403 (Minn. Ct. App. 2004); see also Minn. Stat. §§ 609.75 subdiv. 1(a), 609.76 subdiv. 1.

The record here indicates that Sergeant Ritschel had at least arguable probable cause to arrest Stepnes for running an illegal lottery after receiving the contractor's call and investigating the contest website. The website indicated that contestants had to pay $20 for a chance to win the house or smaller weekly prizes. While the website explained that guessing the number of fasteners in the chest was a "contest of skill" because it involved using "mathematical and analytical skills," the website also advertised a weekly drawing for which no skill was involved and listed a winner of one of the weekly prizes, showing that this aspect of the contest was under way. Upon arriving at the house Ritschel saw a sign on the door advertising the contest, indicating that he was at the correct address.

Stepnes contends that the website was designed in such a way that contestants could enter the weekly drawings without paying $20, thus removing the element of consideration from the weekly drawing. The contest rules on the website did not however inform potential participants of this option. Rather, they explained that "early entry purchases" would be included in the weekly drawings. Use of the term "purchases" could certainly lead a prudent person to believe that consideration was required to enter and thus that the original contest violated Minnesota law. See Rivera, 370 F.3d at 733.

Stepnes also argues that Ritschel could not have had probable cause to make an arrest because he had not investigated all potential sources of exculpatory evidence. That is not the correct test, for "[o]fficers are not required to conduct a 'mini-trial' before arrest, [although] probable cause 'does not exist when a 'minimal further investigation' would have exonerated the suspect.'" Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008) (citations omitted). Stepnes urges that because he informed Ritschel immediately prior to the arrest that he had cleared the contest with Barrett, the officer should have investigated this statement prior to making the arrest. We reject this contention. A contact with Barrett at this point would not have exonerated Stepnes because the state official would have informed Ritschel, as he in fact did the very next day, that the weekly drawings based on chance converted the original contest into an illegal lottery.

In addition to challenging his May 28 arrest, Stepnes claims he was again falsely arrested the following day when officers placed him in the back of a squad car while executing a search warrant at the house. Temporary detention of a building's occupants while a search warrant is executed does not violate the Fourth Amendment. United States v. Johnson, 528 F.3d 575, 579 (8th Cir. 2008) (citing Michigan v. Summers, 452 U.S. 692, 701 (1981)). Stepnes thus cannot demonstrate that his Fourth Amendment rights were violated on this ground.

We turn next to Stepnes's contention that Sergeant Ritschel used excessive force when conducting the May 28 arrest by placing handcuffs on him so tightly that he suffered bruising, numbness, and soreness. The district court determined that these injuries were de minimis and thus could not give rise to an excessive force claim. Stepnes correctly noted at oral argument that we have recently rejected the contention that the presence of only de minimis injury forecloses an excessive force claim. Chambers, 641 F.3d at 906. In the handcuff context, however, Chambers simply reaffirmed our previous holdings that "[f]or the application of handcuffs to amount to excessive force, there must be something beyond minor injuries." Id. at 907 (quoting Hanig v. Lee, 415 F.3d 822, 824 (8th Cir. 2005)). Stepnes has produced no evidence that he suffered anything beyond minor injuries due to the handcuffing and thus cannot demonstrate a Fourth Amendment violation.

Stepnes's next claim asserts that the police conducted an unreasonable search and seizure by exceeding the scope of the search warrant during the search of the house. He contends that this issue was already decided in his favor at the state court hearings where he sought return of seized property, and he thus urges us to apply the doctrine of offensive collateral estoppel to bar Ritschel from defending this claim. At issue in the state court hearing was Stepnes's motion for return of property under Minnesota law, not an adjudication of whether Stepnes's Fourth Amendment rights had been violated. Furthermore, that hearing was held on an emergency basis, giving the city of Minneapolis little time to respond to Stepnes's claims. Accordingly, collateral estoppel is not appropriate because the issue is not identical in the two adjudications and the city of Minneapolis was not given a full and fair opportunity to respond in the state hearing. See Crumley v. City of St. Paul, Minn., 324 F.3d 1003, 1006 (8th Cir. 2003).

Turning to the merits of Stepnes's unreasonable search and seizure claim, he argues that the police exceeded the scope of the search warrant when seizing items from the house. Stepnes focuses on the seizure of the chest and fasteners, arguing that

-10-

these items were not "gambling paraphernalia" subject to seizure because they were part of a contest testing analysis and skill.

Possession of a search warrant does not "give the executing officers carte blanche as to its execution." Walden v. Carmack, 156 F.3d 861, 873 (8th Cir. 1998). When executing a search warrant, a law enforcement official "must have probable cause to believe that items seized in connection with a valid search warrant are associated with suspected criminal activity." Id. Probable cause demands "only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.'" Id. (citations omitted). Items not mentioned in a warrant may be seized so long as they are "reasonably related to the crime for which the warrant issued." Taylor v. State of Minn., 466 F.2d 1119, 1121 (8th Cir. 1972) (per curiam).

At the time of the arrest, Sergeant Ritschel had probable cause to believe that Stepnes was running an illegal lottery in violation of Minnesota law. Between the time of the arrest and the time of the search, Ritschel learned from Barrett that Stepnes had been advised that guessing the number of fasteners in the chest was a game of skill. He also learned however that the weekly prizes introduced an element of chance, meaning that all elements of an illegal lottery were present. Given this knowledge, a reasonably cautious officer could conclude that the chest was associated with criminal activity because at least part of the original contest contained the elements of an illegal lottery. See Walden, 156 F.3d at 873. Furthermore, as the district court correctly noted, the fasteners in the chest were not of uniform size and type. Consequently, it would have been nearly impossible to use mathematical skill to calculate the number of fasteners in the chest. A reasonably cautious person could thus conclude that guessing the number of fasteners in the chest was an illegal lottery. Id. Stepnes's contention that his rights were violated because Ritschel wanted to "shut down" the contest similarly fails because an officer's subjective intent is not relevant

to a probable cause inquiry.  Id. at 869.  We conclude that Ritschel did not violate Stepnes's Fourth Amendment rights when executing the search warrant.

Stepnes's final § 1983 claim is that Ritschel violated his Fourth Amendment rights by authorizing the police crime examiner to view files on the seized computer hard drives in violation of the state judge's order that they not be examined before his never completed in camera review.  Upon learning of this development, Stepnes did not amend his complaint to add this claim as an additional basis for his § 1983 action, but rather moved to strike Ritschel's answer to his complaint.  The district court instead awarded Stepnes attorney fees as a remedy for Ritschel's action.  Stepnes has not shown that the district court abused its discretion by its choice of remedy for the violation of the orders by the state judge.  See Plaintiffs' Baycol Steering Comm. v. Bayer Corp., 419 F.3d 794, 802 (8th Cir. 2005).

Accordingly, because Stepnes failed to demonstrate that any of Sergeant Ritschel's actions violated a constitutional right, he cannot deprive him of qualified immunity, and thus summary judgment was appropriate.  Lykken v. Brady, 622 F.3d 925, 929–30 (8th Cir. 2010).  Summary judgment was also proper as to the city of Minneapolis because municipalities may not be held liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort."  Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978).  Stepnes has not argued on appeal that any municipal "policy or custom" led to a deprivation of his constitutional rights.  See id. at 694.

III.

We now turn to Stepnes's defamation claims against CBS and Murphy.  Under Minnesota law, a cause of action for defamation requires (1) a false and defamatory statement about the plaintiff; (2) an unprivileged publication to a third party; (3) a

tendency to harm the plaintiff's reputation in the community; and (4) fault amounting to at least negligence. Britton v. Koep, 470 N.W.2d 518, 520 (Minn. 1991). If the plaintiff is a public figure, he must show through clear and convincing evidence that the defendant's fault amounted to actual malice. Id. Actual malice requires acting with "knowledge that the statements were false or . . . reckless disregard of whether they were true or false." Id. at 524 (citing N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964)). Accordingly, the plaintiff must show that the "defendant in fact entertained serious doubts as to the truth of his publication." Id. at 524 (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)).

Stepnes first contends that the district court erred in determining that he was a limited purpose public figure which is defined as one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974). In determining whether a person qualifies as a limited purpose public figure, Minnesota courts look to "(1) whether a public controversy existed; (2) whether the plaintiff played a meaningful role in the controversy; and (3) whether the allegedly defamatory statement related to the controversy." Chafoulias v. Peterson, 668 N.W.2d 642, 651 (Minn. 2003). A public controversy is one whose "ramifications will be felt by persons who are not direct participants." Id. (quoting Waldbaum v. Fairchild Publ'ns, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980)). In determining whether a plaintiff played a meaningful role in the controversy, Minnesota courts look to whether the plaintiff's participation was voluntary, the plaintiff played a prominent role in the debate, and the plaintiff had access to effective channels of communication to counteract false statements. Id. at 653.

The district court correctly concluded that Stepnes was a limited purpose public figure. A public controversy existed at the time of Murphy's broadcast because Stepnes's contest and arrest had already been debated in the local press, and both of those issues had ramifications beyond the contest participants. Stepnes also played

a meaningful role in the controversy and had access to effective channels of communication to counteract allegedly defamatory statements: he sought publicity for his contests through engaging public relations personnel, he spoke to the local press following his arrest, and he granted Murphy an interview for her broadcast against the advice of his public relations personnel. Furthermore, all of the allegedly defamatory statements related to the contest and his arrest.

Stepnes responds that his actions were taken in his own defense and that he is allowed to defend himself without becoming a public figure. See Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 168 (1979) (concluding that persons committing criminal conduct do not automatically become public figures by commenting on issues related to their convictions). Stepnes's conduct in respect to this case went beyond defending himself, however. He sought media coverage by using a public relations firm to "shape the message" and "turn a negative spin into a positive spin." Indeed, he chose to grant an interview to Murphy because "ratings were high on [that] station."

Having concluded that the district court correctly determined that Stepnes was a limited purpose public figure, we next consider whether any of the allegedly defamatory statements show the actual malice needed to prevail in such an action. Viewing the facts in the light most favorable to Stepnes, none of these statements indicate either knowledge of falsity or reckless disregard as to the statement's truth or falsity. The first statement Stepnes challenges is the news anchor's "lead in" to the broadcast that "the only place that man [Stepnes] could be moving is jail." He next challenges the anchor's closing statement that "the Minneapolis city attorney's office is investigating the situation." In challenging these statements, Stepnes essentially contends that Murphy and CBS should have known that Stepnes would not ultimately be charged with a crime. The record indicates, however, that Murphy investigated Stepnes's arrest with Sergeant Ritschel, the county jail, and the Minneapolis city attorney's office. Ritschel informed Murphy that he believed Stepnes was conducting

-14-

an illegal lottery, the jail confirmed that Stepnes had in fact been arrested, and a spokesperson from the city attorney's office indicated that the Stepnes matter was still an active investigation. Given these facts, it was not reckless disregard for the truth to conclude that Stepnes may face future incarceration related to the contests.

Stepnes next seizes on two minor inaccuracies in Murphy's broadcast: first, the fact that the Attorney General's office, not the Secretary of State's office as indicated by Murphy, registers charities, and second, that he was arrested for running an illegal lottery, not for violating charitable gambling laws. These statements do not show falsity, let alone a reckless disregard of the truth. Minnesota courts have recognized that a statement is not false for defamation purposes "if its gist or sting is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." Jadwin v. Minneapolis Star & Tribune Co., 390 N.W.2d 437, 441 (Minn. Ct. App. 1986) (citation omitted). Reporters are allowed "some leeway in accuracy when describing legal issues to the public." Id. at 442. Murphy's misstatements cannot support a defamation claim because even had they been completely accurate they would have produced the same "gist or sting" in the mind of the viewer. Id. at 441.

Stepnes finally focuses on what he perceives as the broadcast's overall implication that he hid the fact that the house was in foreclosure. He asserts that the sentence on the website stating "[l]et's take a negative situation and make something positive come out of it" indicates his openness with potential contestants concerning the house's foreclosure status. He also points to evidence that a colleague of Murphy's at WCCO TV had told Murphy that the house was in foreclosure. Stepnes contends that the fact that another WCCO TV employee knew of the foreclosure means that he must not have hidden the house's foreclosure status. Neither of these contentions indicate that Murphy recklessly disregarded the truth in conveying the impression that Stepnes was not open with potential contestants regarding the foreclosure.

-15-

Stepnes also appeals the district court's denial of his motion for spoliation sanctions against CBS stemming from the loss of a videotape containing the original footage of Murphy's interview with Stepnes and his attorney. Stepnes contends that CBS deliberately destroyed this tape and that he was prejudiced because Murphy's facial expressions and body language shown on the tape would have indicated that she harbored serious doubts regarding the truth of several statements in her broadcast. We review a district court's denial of discovery sanctions for an abuse of discretion, giving "substantial deference to the district court's determination." Gallagher v. Magner, 619 F.3d 823, 844 (8th Cir. 2010) (citation omitted).

Severe spoliation sanctions, such as an adverse inference instruction, are only appropriate upon a showing of bad faith. See Menz v. New Holland N. Am., Inc., 440 F.3d 1002, 1006 (8th Cir. 2006). Stepnes urges that lesser sanctions can be imposed upon a finding of gross negligence. While we have not held that a gross negligence standard applies to some spoliation sanctions, even if such a standard did apply, Stepnes could not meet it. The evidence demonstrated that CBS's general policy was to reuse tapes, Murphy was instructed to preserve all materials relevant to the story, and CBS managers sent an email instructing employees to save all tapes. The record further reveals that WCCO TV employees conducted an extensive search for the tape, but it was never found. Nothing in this record indicates that CBS intentionally destroyed the tape or acted with bad faith or gross negligence in respect to it, and thus the district court did not abuse its substantial discretion in denying Stepnes's motion for spoliation sanctions.[2]

IV.

Accordingly, we affirm the judgment of the district court.

_____

[2]Because we find that his spoliation claim lacks merit, we also deny Stepnes's tardy motion to "correct the record" by compelling production of the email instructing employees to save all tapes.

-16-